**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| 4CHAN COMMUNITY SUPPORT LLC; and LOLCOW, LLC, d/b/a KIWI FARMS, <br><br>                    Plaintiffs, <br><br>        v. <br><br> THE UK OFFICE OF COMMUNICATIONS, a/k/a OFCOM, <br><br>                  Defendant. | Case No. 1:25-cv-02880-RC |

**DEFENDANT OFCOM'S MOTION TO DISMISS**

Pursuant to Federal Rules of Civil Procedure 12(b)(1), (3), and (6), defendant UK Office of Communications, a/k/a Ofcom, respectfully moves to dismiss plaintiffs' Complaint in this action. Dkts. 1, 3. This motion is supported by the attached memorandum of points and authorities and the accompanying Declaration of Martin Ralph Ballantyne and exhibits thereto. A proposed order granting the motion is submitted herewith.

Ofcom is the UK's independent communications regulator, created by Parliament to regulate the UK's communications sector much like the Federal Communications Commission regulates that sector in the United States. One of the statutes Ofcom administers is the Online Safety Act 2023. Parliament enacted that statute to make the use of certain internet services safer for individuals in the United Kingdom, particularly children.

Ofcom determined that plaintiff 4chan Community Support LLC is subject to the Online Safety Act because it offers a "user-to-user" internet service to hundreds of thousands of UK users every month and actively markets itself to advertisers on the basis of that substantial UK user base.

1

Ofcom sought information from 4chan about risk assessments for illegal content on its service. Plaintiffs responded by suing Ofcom in this Court, claiming that Ofcom had not properly served them under the US-UK Mutual Legal Assistance Treaty and that Ofcom's actions violate the First Amendment and other constitutional and statutory provisions. Plaintiffs seek declaratory and injunctive relief.

The Court should dismiss this action for several reasons. First, the Court lacks subject matter jurisdiction because Ofcom is a foreign state entity that is entitled to immunity under the Foreign Sovereign Immunities Act ("FSIA"). 28 U.S.C. §§ 1330(a), 1604. Ofcom qualifies as part of the foreign state itself under the "core functions" test because it is a public regulatory authority that exercises traditional government functions. *See Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 151 (D.C. Cir. 1994). Alternatively, Ofcom is entitled to immunity because it qualifies as an "organ" of a foreign state and therefore an agency or instrumentality of a foreign state under the FSIA. 28 U.S.C. § 1603(b). In either case, Ofcom is not subject to jurisdiction under the FSIA's "commercial activity" exception because Ofcom engages in regulatory rather than commercial activities. 28 U.S.C. § 1605(a)(2); *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614-15 (1992).

Alternatively, the Court should dismiss this action in favor of proceedings in the United Kingdom based on forum non conveniens or international comity. The Online Safety Act provides ample opportunities for parties to raise their claims both before Ofcom and on judicial review in the UK courts. Finally, plaintiff Kiwi Farms cannot show either standing or ripeness because Ofcom has taken no administrative actions against it, and because Kiwi Farms's alleged injuries are speculative.

Dated:    December 1, 2025                    Respectfully submitted,
          Washington, D.C.

                                              ␣/s/ Robert K. Kry␣␣␣␣␣␣
                                              Robert K. Kry
                                              D.C. Bar # 490545
                                              Christian I. Bale
                                              D.C. Bar # 90020099
                                              MOLO LAMKEN LLP
                                              The Watergate, Suite 500
                                              600 New Hampshire Avenue, N.W.
                                              Washington, D.C.  20037
                                              (202) 556-2011
                                              rkry@mololamken.com

                                              *Attorneys for the UK Office of
                                              Communications, a/k/a Ofcom*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| 4CHAN COMMUNITY SUPPORT LLC; and LOLCOW, LLC, d/b/a KIWI FARMS, <br><br> Plaintiffs, <br><br> v. <br><br> THE UK OFFICE OF COMMUNICATIONS, a/k/a OFCOM, <br><br> Defendant. | Case No. 1:25-cv-02880-RC |

**DEFENDANT OFCOM'S MEMORANDUM OF POINTS
<u>AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS</u>**

Robert K. Kry
D.C. Bar # 490545
Christian I. Bale
D.C. Bar # 90020099
MOLO LAMKEN LLP
The Watergate, Suite 500
600 New Hampshire Avenue, N.W.
Washington, D.C.  20037
(202) 556-2011
rkry@mololamken.com

*Attorneys for the UK Office of
Communications, a/k/a Ofcom*

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ........................................................................................................ 1

BACKGROUND ....................................................................................................... 2

I.      Ofcom's Structure and Regulatory Mandate ....................................................... 2

II.     Ofcom's Role Under the Online Safety Act ....................................................... 4

III.    Ofcom's Interactions with Plaintiffs ................................................................. 6

        A.      4chan ....................................................................................................... 6

        B.      Kiwi Farms ............................................................................................ 8

IV.     Plaintiffs' Lawsuit ........................................................................................... 9

ARGUMENT ........................................................................................................... 11

I.      Ofcom Has Sovereign Immunity from This Lawsuit ........................................ 11

        A.      Ofcom Is a Foreign State Entity Under the Core Functions Test ......... 12

        B.      Ofcom Is an Organ of a Foreign State Under *Filler* ......................... 15

        C.      Ofcom Is a Foreign State Entity Under *Lebron* ................................ 18

        D.      The Commercial Activity Exception Does Not Apply ......................... 19

II.     The Court Should Dismiss Based on Forum Non Conveniens ........................... 23

III.    The Court Should Dismiss Based on International Comity ................................ 25

IV.     Kiwi Farms Cannot Show Standing or Ripeness .............................................. 26

CONCLUSION ......................................................................................................... 28

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Agudas Chasidei Chabad of U.S. v. Russian Federation,*
   528 F.3d 934 (D.C. Cir. 2008)................................................................................................23

\* *In re Air Crash over S. Indian Ocean on Mar. 8, 2014,*
   946 F.3d 607 (D.C. Cir. 2020)...........................................................................................23, 24

*Anglo-Iberia Underwriting Mgmt. v. P.T. Jamsostek,*
   600 F.3d 171 (2d Cir. 2010).................................................................................................22

*Aulenback, Inc. v. Fed. Highway Admin.,*
   103 F.3d 156 (D.C. Cir. 1997)...............................................................................................27

*Bell Helicopter Textron, Inc. v. Islamic Republic of Iran,*
   734 F.3d 1175 (D.C. Cir. 2013)........................................................................................11, 12

*Cable & Wireless P.L.C. v. FCC,*
   166 F.3d 1224 (D.C. Cir. 1999)............................................................................................14

*Cmty. Fin. Grp., Inc. v. Republic of Kenya,*
   663 F.3d 977 (8th Cir. 2011) ................................................................................................22

*Corporación Mexicana de Mantenimiento Integral, S. de R.L. de C.V. v. Pemex –
   Exploración y Producción,* 832 F.3d 92 (2d Cir. 2016) ......................................................17

*Croesus EMTR Master Fund L.P. v. Federative Republic of Brazil,*
   212 F. Supp. 2d 30 (D.D.C. 2002).......................................................................................25

*Ctr. for Envtl. Sci., Accuracy & Reliability v. Nat'l Park Serv.,*
   75 F. Supp. 3d 353 (D.D.C. 2014).......................................................................................24

*De Csepel v. Republic of Hungary,*
   27 F.4th 736 (D.C. Cir. 2022)..............................................................................................13

*Dep't of Transp. v. Ass'n of Am. R.R.s,*
   575 U.S. 43 (2015)................................................................................................................19

*Doe v. Exxon Mobil Corp.,*
   654 F.3d 11 (D.C. Cir. 2011)...............................................................................................26

*EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.,*
   894 F.3d 339 (D.C. Cir. 2018)..............................................................................................11

*Elgin v. Dep't of Treasury,*
   567 U.S. 1 (2012)..................................................................................................................25

\* *Filler v. Hanvit Bank*,
    378 F.3d 213 (2d Cir. 2004)................................................................15, 16, 17, 18

\* *Han v. Fin. Supervisory Serv.*,
    No. 118-cv-141, 2019 WL 13253806 (D.D.C. Sept. 9, 2019)....................................16, 17, 18

*Hemp Indus. Ass'n v. DEA*,
    36 F.4th 278 (D.C. Cir. 2022)................................................................27

*Hilton v. Guyot*,
    159 U.S. 113 (1895)................................................................25

*Intelsat Glob. Sales & Mktg., Ltd. v. Cmty. of Yugoslav Posts Tels. & Tels.*,
    534 F. Supp. 2d 32 (D.D.C. 2008)................................................................16

*Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*,
    115 F.3d 1020 (D.C. Cir. 1997)................................................................21

*Kurd v. Republic of Turkey*,
    438 F. Supp. 3d 69 (D.D.C. 2020)................................................................26

\* *Lebron v. Nat'l R.R. Passenger Corp.*,
    513 U.S. 374 (1995)................................................................18, 19

*Leffer v. Federal Republic of Germany*,
    No. 1:19-cv-03529, 2022 WL 1598059 (D.D.C. Apr. 18, 2022)................................................................16

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)................................................................26

*Matthew A. Goldstein, PLLC v. U.S. Dep't of State*,
    851 F.3d 1 (D.C. Cir. 2017)................................................................27

*MBI Grp., Inc. v. Credit Foncier du Cameroun*,
    558 F. Supp. 2d 21 (D.D.C. 2008)................................................................25

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 (1996)................................................................14

*Millen Indus., Inc. v. Coordination Council for N. Am. Affs.*,
    855 F.2d 879 (D.C. Cir. 1988)................................................................21

*Nat. Res. Def. Council, Inc. v. EPA*,
    859 F.2d 156 (D.C. Cir. 1988)................................................................27

*New England Power Generators Ass'n, Inc. v. FERC*,
    707 F.3d 364 (D.C. Cir. 2013)................................................................27

*OBB Personenverkehr AG v. Sachs,*
  577 U.S. 27 (2015)......................................................................................21

\* *Peninsula Asset Mgmt. (Cayman) Ltd. v. Hankook Tire Co.,*
  476 F.3d 140 (2d Cir. 2007)...............................................................17, 18

*Phoenix Consulting Inc. v. Republic of Angola,*
  216 F.3d 36 (D.C. Cir. 2000).....................................................................12

*Piper Aircraft Co. v. Reyno,*
  454 U.S. 235 (1981)....................................................................................23

\* *Republic of Argentina v. Weltover, Inc.,*
  504 U.S. 607 (1992)........................................................................20, 21, 22

*Roeder v. Islamic Republic of Iran,*
  333 F.3d 228 (D.C. Cir. 2003)..............................................................12, 13

*Rush-Presbyterian-St. Luke's Med. Ctr. v. Hellenic Republic,*
  877 F.2d 574 (7th Cir. 1989) .....................................................................22

*Ryzhov v. Russian Federation,*
  No. 23-cv-2794, 2024 WL 81281 (D.D.C. Jan. 8, 2024).........................22

*Sabre, Inc. v. U.S. Dep't of Transp.,*
  429 F.3d 1113 (D.C. Cir. 2005)..................................................................26

*Saudi Arabia v. Nelson,*
  507 U.S. 349 (1993)..............................................................................20, 21

*Society of Lloyd's v. Siemon-Netto,*
  457 F.3d 94 (D.C. Cir. 2006)......................................................................23

*Thunder Basin Coal Co. v. Reich,*
  510 U.S. 200 (1994)....................................................................................25

\* *Transaero, Inc. v. La Fuerza Aerea Boliviana,*
  30 F.3d 148 (D.C. Cir. 1994)................................................................12, 14

*United States v. One Gulfstream G-V Jet Aircraft,*
  941 F. Supp. 2d 1 (D.D.C. 2013)...............................................................26

*Usoyan v. Republic of Turkey,*
  6 F.4th 31 (D.C. Cir. 2021).........................................................................26

*World Wide Minerals, Ltd. v. Republic of Kazakhstan,*
  296 F.3d 1154 (D.C. Cir. 2002)..................................................................21

STATUTES

28 U.S.C. § 1330(a)..............................................................................................................11

28 U.S.C. § 1603(a)..............................................................................................................15

28 U.S.C. § 1603(b)..............................................................................................................15

28 U.S.C. § 1603(d).............................................................................................................20

28 U.S.C. § 1604...............................................................................................10, 11, 15, 19

28 U.S.C. § 1605(a)(2).................................................................................................10, 20

28 U.S.C. § 1605(a)(3).........................................................................................................15

35 U.S.C. § 42.......................................................................................................................15

Foreign Sovereign Immunities Act of 1976,
    Pub. L. No. 94-583, 90 Stat. 2891 (1976)...................................................11, 15, 19, 20

Public Records Act 1958, 6 & 7 Eliz. 2, c. 51 (U.K.)..................................................3, 18

Freedom of Information Act 2000, c. 36 (U.K.)..........................................................3, 18

Office of Communications Act 2002, c. 11 (U.K.).............................................................2

Communications Act 2003, c. 21 (U.K.) .....................................................................3, 16

Online Safety Act 2023, c. 50 (U.K.) .....................................................................4, 5, 6, 10, 23

OTHER AUTHORITIES

William S. Dodge, *International Comity in American Law*,
    115 Colum. L. Rev. 2071 (2015) ................................................................................26

David P. Stewart, *The Foreign Sovereign Immunities Act: A Guide for Judges*
    (Fed. Jud. Ctr. 2d ed. 2018). ......................................................................................16

14A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure*
    § 3662.3 (4th ed. rev. 2025) ........................................................................................22

Defendant UK Office of Communications, a/k/a Ofcom, respectfully submits this memorandum of points and authorities in support of its motion to dismiss.

## INTRODUCTION

Ofcom is the UK's independent communications regulator, created by Parliament to regulate the UK's communications sector much like the Federal Communications Commission regulates that sector in the United States. One of the statutes Ofcom administers is the Online Safety Act 2023. Parliament enacted that statute to make the use of certain internet services safer for individuals in the United Kingdom, particularly children. Among other things, the Act requires providers of "user-to-user" internet services to assess and mitigate the risk that UK users will encounter illegal content on topics such as terrorism and child sexual abuse and exploitation.

Contrary to plaintiffs' overheated rhetoric, Ofcom is not a global internet czar. The Online Safety Act applies only to services that have "links with the United Kingdom." Plaintiff 4chan, for example, is subject to the Act because it serves hundreds of thousands of UK users every month and actively markets itself to advertisers on the basis of that substantial UK user base. Conversely, after plaintiff Kiwi Farms responded to Ofcom's initial outreach by blocking UK-based IP addresses from its service, Ofcom suspended its inquiries.

Ofcom sought information from 4chan about risk assessments for illegal content on its service. 4chan ignored Ofcom's correspondence for months. Eventually, 4chan informed Ofcom that it was refusing to comply with the information notices because Ofcom had not served them through the US-UK Mutual Legal Assistance Treaty and because the requests violated the First Amendment. When Ofcom issued a decision finding that 4chan had failed to comply with its requests, 4chan responded: "Thank you for the several dozen pages of, in America, legally void correspondence. It will make excellent bedding for my pet hamster."

4chan and Kiwi Farms filed this lawsuit against Ofcom, claiming that the American Revolution prevents the UK from regulating U.S.-based internet services, even when the services furnish illegal content to hundreds of thousands of UK users.  Some court, in some future case, may have to resolve complex cross-border regulatory issues under the Online Safety Act.  But this is not that case.  Plaintiffs' lawsuit fails at the outset because it ignores basic sovereign immunity principles.  Ofcom is a foreign public regulatory authority that qualifies as a foreign state entity under the Foreign Sovereign Immunities Act.  And while plaintiffs implausibly assert that Ofcom engages in a "commercial activity" by seeking to regulate their internet services, Ofcom's actions are plainly regulatory, not commercial.  UK businesses cannot sue the Federal Communications Commission in the London High Court over regulatory disagreements.  For the same reasons, plaintiffs cannot sue Ofcom in this Court either.

## BACKGROUND

## I.    OFCOM'S STRUCTURE AND REGULATORY MANDATE

Ofcom is the UK's independent communications regulator.  Ballantyne Decl. ¶2.[1]  Ofcom has regulatory jurisdiction over fixed-line and mobile telecommunications, television and radio broadcasting, the postal service, the radio spectrum used by wireless devices, and online safety.  *Id.*  Parliament established Ofcom in 2002 by enacting the Office of Communications Act 2002.  Ballantyne Decl. ¶3 & Ex. 1.  Ofcom is a statutory corporation, meaning that its existence, powers, functions, and duties derive from legislation.  Ballantyne Decl. ¶4.  Ofcom has separate legal personality from the UK Government and the capacity to sue and be sued in its own name.  *Id.*  Unlike a private business corporation, however, Ofcom has no share capital or shareholders.  *Id.*

---

[1] Citations to "Ballantyne Decl." are to the accompanying Declaration of Martin Ralph Ballantyne.

The UK Government plays a paramount role in appointing Ofcom's leadership. The Secretary of State appoints Ofcom's chairman and most of its other non-executive members, while ministers of Scotland, Wales, and Northern Ireland appoint one non-executive member each. Ballantyne Decl. ¶5. Ofcom's chairman and non-executive members then appoint Ofcom's chief executive (subject to the Secretary of State's approval) as well as its other executive members. *Id.* ¶6. The Secretary of State can remove Ofcom's chairman and other non-executive members for misbehavior and other specified causes. *Id.* ¶7.

The UK Government oversees Ofcom's key corporate functions. The Secretary of State sets the compensation for Ofcom's chair and other non-executive members. Ballantyne Decl. ¶8. The UK Government supervises Ofcom's finances, setting caps on Ofcom's spending and directing the disposition of excess revenues. *Id.* ¶9. And Ofcom must submit annual statements of account and reports on its operations to the UK Government. *Id.* ¶¶11-12.

The UK Government classifies Ofcom as a public entity. By statute, Ofcom is a public authority under the Freedom of Information Act 2000, and its records are public records under the Public Records Act 1958. Ballantyne Decl. ¶13. The UK Government lists Ofcom as one of 416 "[a]gencies and other public bodies" on its website. Ballantyne Decl. ¶14 & Ex. 2. The UK Office of National Statistics classifies Ofcom as a "Central Government" body. Ballantyne Decl. ¶15 & Ex. 3. English courts treat Ofcom as a public authority too. Ballantyne Decl. ¶16. Even so, Ofcom is not a Crown entity, and its employees are not civil servants. *Id.* ¶17.

The main legislation governing Ofcom's regulatory responsibilities is the Communications Act 2003. Ballantyne Decl. ¶18 & Ex. 6. That Act transferred to Ofcom various regulatory responsibilities in the communications sector that were previously exercised by other agencies. Ballantyne Decl. ¶19. Ofcom is the sole public authority with responsibility for those regulatory functions. *Id.* According to the 2003 Act, "[i]t shall be the principal duty of OFCOM, in carrying

out their functions – (a) to further the interests of citizens in relation to communications matters; and (b) to further the interests of consumers in relevant markets, where appropriate by promoting competition." *Id.* ¶ 20; *see also* Ballantyne Decl. Ex. 7 (excerpt from Ofcom's most recent Annual Report and Accounts describing its regulatory operations).

## II.    OFCOM'S ROLE UNDER THE ONLINE SAFETY ACT

In 2023, Parliament granted Ofcom additional responsibilities by enacting the Online Safety Act 2023.  Ballantyne Decl. ¶ 23 & Ex. 8.  The Online Safety Act's central objective is to make the use of internet services safer for UK individuals, particularly children.  Ballantyne Decl. ¶ 24.  The Act applies to certain internet services, including "user-to-user services," if those services have "links with the United Kingdom" and are not exempted.  *Id.* ¶ 25.  A user-to-user service has "links with the United Kingdom" only if (1) "the service has a significant number of United Kingdom users"; (2) "United Kingdom users form one of the target markets for the service (or the only target market)"; or (3) "the service is capable of being used in the United Kingdom by individuals" and "there are reasonable grounds to believe that there is a material risk of significant harm to individuals in the United Kingdom presented by . . . user-generated content present on the service."  *Id.* (quoting Online Safety Act § 4(5)-(6)).  The Act thus focuses specifically on protecting **UK internet users** and does not seek to regulate foreign internet services when they offer services in other countries.

The Online Safety Act imposes duties of care with respect to certain illegal content, such as content relating to terrorism or child sexual exploitation and abuse.  Ballantyne Decl. ¶ 26.  The Act requires service providers to conduct an illegal content risk assessment that evaluates the risk that users may encounter illegal content on the service and that the service may be used to commit or facilitate an offense.  *Id.*  The Act also requires service providers to take proportionate measures to prevent individuals in the UK from encountering certain illegal content and to mitigate and

manage the risk of the service being used to commit or facilitate certain offenses.  *Id.*  Those duties apply only to "the design, operation and use of the service in the United Kingdom" and "the design, operation and use of the service as it affects United Kingdom users of the service."  *Id.* ¶ 27 (quoting Online Safety Act § 8(3)).  In other words, the Act's illegal content provisions impose no duties on foreign service providers except with respect to the design, operation, and use of their service in the UK and to the extent their service affects UK users.  *Id.*

The Online Safety Act appoints Ofcom as the UK's regulator for online safety.  Ballantyne Decl. ¶ 28.  The Act directs Ofcom to secure "adequate protection of citizens from harm presented by content on regulated services, through the appropriate use by providers of such services of systems and processes designed to reduce the risk of such harm."  *Id.*

The Online Safety Act grants Ofcom various powers to fulfill that regulatory mandate. Ballantyne Decl. ¶ 29.  For example, the Act requires Ofcom to issue codes of practice for regulated services, setting out measures recommended for compliance.  *Id.*  It also authorizes Ofcom to make regulations implementing the Act.  *Id.*

The Act empowers Ofcom to gather the information it needs.  Section 100 permits Ofcom to serve notices requiring service providers or third parties to provide information that Ofcom requires to exercise or decide whether to exercise any of its online safety functions.  Ballantyne Decl. ¶ 30.  A person receiving an information notice must act in accordance with the requirements of the notice when responding and must ensure that the information provided is accurate in all material respects.  *Id.* ¶ 31.

Ofcom may conduct investigations to determine whether a service provider has engaged or is engaging in conduct that violates the Act.  Ballantyne Decl. ¶ 32.  Ofcom may issue a provisional notice of contravention if it finds reasonable grounds for believing a violation has occurred.  *Id.* ¶ 33.  The service provider may make representations and submit evidence in response.  *Id.*  If

Ofcom is still satisfied with its finding of a violation, it may issue a confirmation decision imposing compliance requirements and/or financial penalties. *Id.* ¶ 34.

The Online Safety Act does not grant Ofcom any power to censor content. Ballantyne Decl. ¶ 36. Ofcom may apply to a court for an order requiring third parties (such as search engines, ad servers, or internet service providers) to take steps to disrupt the business of a non-compliant regulated service provider. *Id.* But any such court order must be limited, so far as possible, to measures "relating to the operation of the relevant service as it affects United Kingdom users" or measures "that impede the access of United Kingdom users." *Id.*

Section 168 of the Online Safety Act provides for judicial review of Ofcom's confirmation decisions and penalty notices in the UK courts. Ballantyne Decl. ¶ 37. The service provider may appeal to the Upper Tribunal, a specialized judicial tribunal that handles certain administrative appeals. *Id.* The Upper Tribunal may either dismiss the appeal or quash the decision and remit the matter to Ofcom with directions. *Id.* Decisions of the Upper Tribunal may be appealed to the Court of Appeal. *Id.*

## III.    OFCOM'S INTERACTIONS WITH PLAINTIFFS

As part of Ofcom's efforts to promote compliance with the Online Safety Act, Ofcom sought to engage with service providers before the Act's duties came into effect. Ballantyne Decl. ¶ 38. Two of those service providers were plaintiffs 4chan Community Support LLC ("4chan") and Lolcow, LLC, d/b/a Kiwi Farms ("Kiwi Farms").

### A.    4chan

As noted above, the Online Safety Act requires user-to-user internet services to comply with its obligations if "the service has a significant number of United Kingdom users" or if "United Kingdom users form one of the target markets for the service (or the only target market)." Ballantyne Decl. ¶ 25 (quoting Online Safety Act § 4(5)-(6)). Applying the statutory test, Ofcom

determined that 4chan was subject to the Act. *First*, the 4chan.org website states that 4chan has over 20 million unique visitors per month and that over 7% of 4chan's user base is UK users. *Id.* ¶ 40. Ofcom determined that a UK user base of hundreds of thousands of persons is a "significant number" within the meaning of the Act. *Id.* Second, the advertising section of the 4chan.org website markets the platform to advertisers on the basis that 7% of its users are from the UK, the second largest percentage behind the United States. *Id.* ¶ 41. Based on that information, Ofcom determined that the UK "form[s] one of the target markets" for 4chan's service. *Id.*

On March 27, 2025, Ofcom contacted 4chan by email, offering an introductory meeting and informing 4chan that Ofcom believed 4chan to be subject to the Act. Ballantyne Decl. ¶ 43. On April 8, Ofcom contacted 4chan again to reiterate its offer of a meeting. *Id.* 4chan did not respond to either email. *Id.*

On April 14, 2025, Ofcom sent an information notice to 4chan seeking a written record of the illegal content risk assessment that 4chan was required to prepare under the Act. Ballantyne Decl. ¶ 44. On June 16, Ofcom issued a second notice seeking information about 4chan's qualifying worldwide revenues. *Id.*

On August 12, 2025, Ofcom issued a provisional notice of contravention, finding that 4chan had failed to comply with either of its information notices. Ballantyne Decl. ¶ 45. On August 16, 4chan's counsel responded by informing Ofcom that 4chan was an American company with no establishment, assets, or operations in the United Kingdom, and referencing the First Amendment. *Id.* ¶ 46. 4chan's counsel also objected that Ofcom had not invoked the Mutual Legal Assistance Treaty between the UK and the U.S. when serving documents on 4chan. *Id.*

On October 13, 2025, Ofcom sent a confirmation decision to 4chan adhering to the findings in its provisional notice. Ballantyne Decl. ¶ 47. 4chan's counsel responded on October 14, stating:

"Thank you for the several dozen pages of, in America, legally void correspondence.  It will make excellent bedding for my pet hamster."  *Id.*

On November 18, 2025, Ofcom published a non-confidential version of the confirmation decision.  Ballantyne Decl. ¶ 48 & Ex. 9.  That decision requires 4chan to comply with the two information notices and imposes a fixed penalty of £20,000 on 4chan for its failure to comply, as well as a daily rate penalty of £100 per day.  *Id.*  4chan has the right to appeal that decision to the Upper Tribunal in the UK.  *Id.*

### B.    Kiwi Farms

On March 26, 2025, Ofcom sent a letter to Kiwi Farms, offering an introductory meeting and informing Kiwi Farms that Ofcom considered it likely that Kiwi Farms was subject to the Online Safety Act.  Ballantyne Decl. ¶ 50.  Ofcom stated that it planned to send an information notice on or around April 3.  *Id.*  On March 31, Kiwi Farms responded through counsel, disputing Ofcom's authority.  *Id.* ¶ 51.

On April 29, 2025, after observing that Kiwi Farms had blocked UK-based IP addresses from accessing its service, Ofcom informed Kiwi Farms that it had decided not to proceed with issuing an information notice.  Ballantyne Decl. ¶ 52.  On July 25, after discovering that the website had become accessible to UK users again, Ofcom sent an email to Kiwi Farms's counsel requesting clarification of Kiwi Farms's intentions.  *Id.* ¶ 53.  Kiwi Farms's counsel responded later that day, asserting that Ofcom was required to use the US-UK Mutual Legal Assistance Treaty to serve documents and invoking the First Amendment.  *Id.* ¶ 54.  Kiwi Farms's counsel also explained that "the IP blocking feature is currently down for maintenance" and that, "[o]nce it is back up, my client will, in all probability, restore the nation-level block of the UK."  *Id.*

8

As of the present date, Ofcom has not sent any information notice to Kiwi Farms, has not opened any investigation into Kiwi Farms's compliance with the Act, has not issued any provisional notice of contravention to Kiwi Farms, has not issued any confirmation decision with respect to Kiwi Farms, and has not imposed any penalties on Kiwi Farms. Ballantyne Decl. ¶ 55.

## IV.    PLAINTIFFS' LAWSUIT

On August 27, 2025, 4chan and Kiwi Farms filed this lawsuit against Ofcom. Dkt. 1; Dkt. 3 ("Compl."). The Complaint asserts four counts. Counts One and Two seek declaratory judgments that Ofcom did not properly serve 4chan and Kiwi Farms because it did not invoke the US-UK Mutual Legal Assistance Treaty. Compl. ¶¶ 117-131. Count Three seeks a declaratory judgment that Ofcom's two information notices to 4chan violate 4chan's constitutional and statutory rights. *Id.* ¶¶ 132-139. Count Four seeks a similar declaratory judgment based on Ofcom's March 26, 2025 "advisory letter" to Kiwi Farms (in which Ofcom stated its plans to send an information notice at a later date) and Ofcom's July 25, 2025 "demand" (an email inquiring about Kiwi Farms's intentions following the lapse of its IP block). *Id.* ¶¶ 140-147. The Complaint seeks both declaratory and injunctive relief. Compl. at 22.

Plaintiffs allege in sweeping terms that "Ofcom's ambitions are to regulate Internet communications for the entire world, regardless of where these websites are based or whether they have any connection to the UK." Compl. ¶ 26. The Complaint offers no support for that extravagant claim and ignores statutory text that contradicts it. For example, the Complaint nowhere mentions the Online Safety Act's express limitation to services that have "links *with the United Kingdom*" – a standard that a user-to-user service meets only if (1) "the service has a significant number of United Kingdom users"; (2) "United Kingdom users form one of the target markets for the service (or the only target market)"; or (3) "the service is capable of being used in the United Kingdom" and poses "a material risk of significant harm to individuals in the United

Kingdom." Ballantyne Decl. ¶ 25 (quoting Online Safety Act § 4(5)-(6)) (emphasis added). The Complaint likewise ignores that the Online Safety Act imposes duties on user-to-user service providers only with respect to "the design, operation and use of the service in the United Kingdom" and "the design, operation and use of the service as it affects United Kingdom users of the service." *Id.* ¶ 27 (quoting Online Safety Act § 8(3)).

The Complaint does not deny that Ofcom applied those statutory standards to assert jurisdiction over 4chan. Nor does it dispute the factual basis for Ofcom's findings. According to 4chan's own website, 4chan has over 20 million unique visitors per month, over 7% of whom are in the United Kingdom. Ballantyne Decl. ¶ 40 & Ex. 9 at 35. 4chan's advertising page markets the platform to advertisers on the ground that 7% of its users are from the UK – the second largest percentage behind the United States. Ballantyne Decl. ¶ 41 & Ex. 9 at 35.

The Complaint makes no serious effort to engage with the obvious sovereign immunity obstacles to this lawsuit. It asserts that "Ofcom is a private corporation that acts as an official censor of the British state even through it is not an instrumentality of the British state and not entitled to sovereign immunity under 28 USCS § 1604." Compl. ¶ 30. But the Complaint provides no support for that characterization of Ofcom as a "private corporation" and no analysis justifying the assertion that Ofcom "is not an instrumentality of the British state."

The Complaint asserts without explanation that "Ofcom is a commercial enterprise" and that, "[i]f the Court determines that Ofcom is an instrumentality of the UK, then Ofcom's activities constitute 'commercial activity' carried on in the United States under 28 USCS § 1605(a)(2)." Compl. ¶¶ 44-45. But the Complaint offers no explanation of how Ofcom's regulatory activities could be considered "commercial." Nor does it reconcile that "commercial enterprise" description with its acknowledgment elsewhere that Ofcom exercises ***regulatory*** authority. *See, e.g., id.* ¶ 25

("Defendant Ofcom is a statutory corporation charged with regulating broadcasting and online communications within the United Kingdom.").

## ARGUMENT

Plaintiffs responded to Ofcom's efforts to regulate their user-to-user internet services by suing Ofcom in federal court. The sovereign immunity problems with this lawsuit are obvious, and plaintiffs make no serious attempt to overcome them. Ofcom is the UK's communications regulator that carries out core regulatory functions to protect UK internet users. Ofcom qualifies as part of the foreign state itself under the "core functions" test. At a minimum, Ofcom qualifies as an agency or instrumentality because it is an "organ" of a foreign state. Either way, Ofcom is a foreign state entity, and its regulatory functions do not remotely fall within the "commercial activity" exception to sovereign immunity. This Court therefore lacks subject matter jurisdiction and should dismiss this suit.

## I.    OFCOM HAS SOVEREIGN IMMUNITY FROM THIS LAWSUIT

The Foreign Sovereign Immunities Act ("FSIA") provides that "a foreign state shall be immune from the jurisdiction of the courts of the United States . . . except as provided in sections 1605 to 1607." 28 U.S.C. § 1604. Conversely, the Act grants jurisdiction only "as to any claim for relief in personam with respect to which the foreign state is ***not*** entitled to immunity . . . under sections 1605-1607." 28 U.S.C. § 1330(a) (emphasis added). Thus, unless an exception to immunity applies, the Court lacks subject matter jurisdiction and must dismiss the suit.

Under the FSIA, "the foreign-state defendant bears the burden of establishing . . . immunity." *EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.*, 894 F.3d 339, 345 (D.C. Cir. 2018). Once the defendant establishes "a presumption of immunity, . . . the plaintiff bears the initial burden to overcome [the presumption] by producing evidence that an exception applies." *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013).

11

If the plaintiff meets that burden, "the sovereign bears the ultimate burden of persuasion to show the exception does not apply." *Id.* Where, as here, the defendant challenges "the factual basis of the court's subject matter jurisdiction under the FSIA," the court "must go beyond the pleadings and resolve any disputed issues . . . necessary to a ruling upon the motion to dismiss." *Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000).

A.      **Ofcom Is a Foreign State Entity Under the Core Functions Test**

Ofcom qualifies as a foreign state entity under the FSIA because it is a public regulatory authority whose core functions are governmental in nature. Ofcom is thus part of the foreign state itself under the "core functions" test.

The D.C. Circuit has adopted the "core functions" test for determining whether an entity is part of the foreign state itself as opposed to a separate agency or instrumentality. *See Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 151 (D.C. Cir. 1994). That test turns on whether "the core functions of the foreign entity are predominantly governmental or commercial." *Id.* The Court examines whether "the defendant is the type of entity 'that is an integral part of a foreign state's political structure, [or rather] an entity whose structure and function is predominantly commercial.'" *Id.* at 151. "[I]f the core functions of the entity are governmental, it is considered the foreign state itself; if commercial, the entity is an agency or instrumentality of the foreign state." *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 234 (D.C. Cir. 2003).

In *Transaero*, for example, the D.C. Circuit held that the Bolivian Air Force was part of the foreign state itself rather than a separate agency or instrumentality. 30 F.3d at 153. The court held that "armed forces are as a rule so closely bound up with the structure of the state that they must in all cases be considered as the 'foreign state' itself, rather than a separate 'agency or instrumentality' of the state." *Id.* "The 'powers to declare and wage war,'" it noted, "are among the 'necessary concomitants' of sovereignty." *Id.* Similarly, in *Roeder*, the court held that Iran's

12

Ministry of Foreign Affairs was part of the state itself under the core functions test.  333 F.3d at 234.  The court reasoned that "[t]he conduct of foreign affairs is an important and 'indispensable' governmental function."  *Id.* at 234-35.

By contrast, in *De Csepel v. Republic of Hungary*, 27 F.4th 736 (D.C. Cir. 2022), the court held that a Hungarian state property holding company was ***not*** part of the state itself under the core functions test.  The entity "exercise[d] ownership rights over about 450 companies, including 'a major Hungarian energy group,' 'the largest gambling service provider in Hungary,' and a 'waste management' holding company."  *Id.* at 744-45.  It also "manage[d] almost 100,000 state-owned movable properties, including 'road vehicles,' 'musical instruments,' and 'works of art.'"  *Id.* at 745.  "Given the myriad types of property that can be held privately or as state assets," the court could not "conclude that the function of holding and managing property, in and of itself, is 'so closely bound up with the structure of the state that [it] must in all cases be considered' a governmental rather than commercial function."  *Id.* at 744; *see also id.* (endorsing district court decisions holding that "a South Korean cultural foundation" and "a Russian library and military archive" were agencies or instrumentalities rather than part of the state itself).

Ofcom qualifies as part of the state itself under the core functions test.  Ofcom's core functions are governmental rather than commercial.  Parliament created Ofcom by statute to ***regulate*** the communications sector in the UK.  Ballantyne Decl. ¶¶ 2-3, 18-20.  Parliament then expanded that regulatory mandate to include online safety in the Online Safety Act.  *Id.* ¶ 28 (directing Ofcom to ensure "adequate protection of citizens from harm presented by content on regulated services, through the appropriate use by providers of such services of systems and processes designed to reduce the risk of such harm").  Parliament granted the Secretary of State authority to appoint and remove Ofcom's leadership and to oversee Ofcom's key corporate functions.  *Id.* ¶¶ 5-12.  And Ofcom exercises its authority through traditional regulatory

mechanisms such as rulemaking, information demands, investigations, and penalties on regulated parties. *Id.* ¶¶ 29-34.

There is a broad international consensus that telecommunications regulation is an inherently governmental function. "[I]t is the sovereign right of each country to regulate its telecommunications." *Cable & Wireless P.L.C. v. FCC*, 166 F.3d 1224, 1230 (D.C. Cir. 1999) (quoting the preamble to the International Telecommunications Union Treaty). That regulatory priority is nowhere more important than when it is exercised – as it is here – to promote public safety. *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996) ("Throughout our history the several States have exercised their police powers to protect the health and safety of their citizens."). The UK Government created Ofcom and charged it to regulate online safety and other communications matters to protect UK citizens from harm, not to compete in a commercial marketplace. Ofcom is no less governmental than the Federal Communications Commission, its counterpart under U.S. law. Any differences in how those two regulators approach online safety do not make the UK's regulatory apparatuses any less governmental in nature.

Plaintiffs' attempt to dismiss Ofcom as a mere "private corporation," Compl. ¶ 30, ignores that statutory framework. Ofcom is not a private business corporation set up by stockholders. It is a ***statutory*** corporation created by Parliament that derives its powers directly from legislation. Ballantyne Decl. ¶ 4. Although Ofcom has its own separate legal personality and capacity to sue and be sued in its own name, those features do not determine Ofcom's status under the core functions test. *See Transaero*, 30 F.3d at 152 ("[A]ny nation may well find it convenient (as does ours) to give powers of contract and litigation to entities that on any reasonable view must count as part of the state itself.").

Nor is Ofcom a commercial venture merely because it has statutory authority to finance its operations in part from fees on regulated entities. Compl. ¶¶ 41-42. Fees are not profits. Ofcom

is required to balance its revenues with expenses and must distribute any excess revenues as its sponsoring ministry directs. Ballantyne Decl. ¶9. Ofcom is hardly unique: Many U.S. government agencies finance their operations through user fees too. *See, e.g.*, 35 U.S.C. § 42 (Patent and Trademark Office).

Finally, plaintiffs seem to suggest that Ofcom engages in commercial activities because it conducts "content moderation policy-writing services" that are "normally performed by technology companies in-house in legal and policy departments." Compl. ¶¶38-39. But as plaintiffs admit, "[u]nlike policy frameworks which have been developed in-house, . . . Ofcom's commercial policymaking purports to be compulsory." *Id.* ¶40. A private company's voluntary procedures do not make Ofcom's **compulsory** mandates any less regulatory in nature.

## B.    Ofcom Is an Organ of a Foreign State Under *Filler*

Alternatively, Ofcom is entitled to immunity as an "agency of instrumentality" of a foreign state. The Foreign Sovereign Immunities Act defines "foreign state" to "include[ ] . . . an agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a). Agencies and instrumentalities enjoy the same jurisdictional immunity as the state itself, except where the Act prescribes different standards. 28 U.S.C. § 1604; *see, e.g.*, 28 U.S.C. § 1605(a)(3) (expropriation claims).

The Act defines an "agency or instrumentality" as an entity that (1) "is a separate legal person, corporate or otherwise"; (2) "is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof"; and (3) "is neither a citizen of a State of the United States . . . nor created under the laws of any third country." 28 U.S.C. § 1603(b). The first and third requirements are clearly met here. Ofcom is a "separate legal person." Ballantyne Decl. ¶4 & Ex. 1 § 1(1) (establishing Ofcom as a "body corporate"). And Ofcom was formed under UK law, not the laws of the United States or any third country. *Id.*

15

The second requirement is also met. To be sure, Ofcom has no share capital or shareholders, so Section 1603(b)'s majority-shareholder prong is inapplicable. Ballantyne Decl. ¶ 4. But Section 1603(b)'s "organ" prong exists for precisely these circumstances: "The point was that a noncorporate structure – one as to which the notion of 'ownership interest' was inapposite – could still fall within the meaning of 'agency or instrumentality' if it met the separate entity and nationality criteria." David P. Stewart, *The Foreign Sovereign Immunities Act: A Guide for Judges* 41 (Fed. Jud. Ctr. 2d ed. 2018). Ofcom is an "agency or instrumentality" because it qualifies as an "organ" of the UK Government.

The FSIA does not define the term "organ." But in *Filler v. Hanvit Bank*, 378 F.3d 213 (2d Cir. 2004), the Second Circuit adopted a five-factor balancing test: "(1) whether the foreign state created the entity for a national purpose; (2) whether the foreign state actively supervises the entity; (3) whether the foreign state requires the hiring of public employees and pays their salaries; (4) whether the entity holds exclusive rights to some right in the [foreign] country; and (5) how the entity is treated under foreign state law." *Id.* at 217. Courts in this District regularly apply that standard. *See, e.g.*, *Han v. Fin. Supervisory Serv.*, No. 118-cv-141, 2019 WL 13253806, at *18-20 (D.D.C. Sept. 9, 2019), *adopted in part*, 2022 WL 2438513 (D.D.C. July 5, 2022); *Leffer v. Federal Republic of Germany*, No. 1:19-cv-03529, 2022 WL 1598059, at *2 (D.D.C. Apr. 18, 2022), *aff'd*, No. 22-7076, 2022 WL 17244766 (D.C. Cir. Nov. 28, 2022); *Intelsat Glob. Sales & Mktg., Ltd. v. Cmty. of Yugoslav Posts Tels. & Tels.*, 534 F. Supp. 2d 32, 34-36 (D.D.C. 2008).

At least four of the five *Filler* factors favor organ status here.

**National Purpose.** Parliament created Ofcom for a national purpose. Section 3(1) of the Communications Act 2003 declares that "[i]t shall be the principal duty of OFCOM, in carrying out their functions – (a) to further the interests of citizens in relation to communications matters; and (b) to further the interests of consumers in relevant markets, where appropriate by promoting

competition." Ballantyne Decl. ¶20 (quoting Ex. 6 §3(1)). Parliament thus formed Ofcom to carry out the important national purpose of regulating communications markets and protecting UK citizens in those markets (including, after the Online Safety Act, by regulating online safety). Courts have repeatedly found similar regulatory mandates to qualify as "national purposes." *See, e.g.*, *Han*, 2019 WL 13253806, at *18 ("promoting the advancement of the financial industry and the stability of financial markets, by establishing sound credit order and fair financial transaction practices"); *Peninsula Asset Mgmt. (Cayman) Ltd. v. Hankook Tire Co.*, 476 F.3d 140, 143 (2d Cir. 2007) ("examining, supervising, and investigating Korean financial institutions"); *Corporación Mexicana de Mantenimiento Integral, S. de R.L. de C.V. v. Pemex – Exploración y Producción*, 832 F.3d 92, 117 (2d Cir. 2016) (Winter, J., concurring) ("central planning and management of Mexico's petroleum industry").

**Active Supervision.** The UK Government actively supervises Ofcom. Government ministers appoint Ofcom's chairman and all non-executive members of its governing board, and those members in turn appoint all of Ofcom's executive members. Ballantyne Decl. ¶¶5-6 (citing Ex. 1 §1(2)-(5) & sched. ¶5(2)). That appointment authority alone is an important mechanism of active supervision. *See Pemex*, 832 F.3d at 117 (Winter, J., concurring) (finding factor met where "the Mexican government appoints all members of PEMEX's board of directors"); *Filler*, 378 F.3d at 217 (similar). Beyond that power, the Secretary of State can also remove Ofcom's board members for specified causes. Ballantyne Decl. ¶7. She sets their compensation and allowances. *Id.* ¶8. And she oversees Ofcom's finances in multiple respects. *Id.* ¶¶9-12. Those control mechanisms are sufficient to constitute active supervision. *See, e.g.*, *Han*, 2019 WL 13253806, at *19 (finding government oversight of financial regulator based on similar control mechanisms); *Peninsula Asset Mgmt.*, 476 F.3d at 143 (similar).

**Public Employees**. This factor is neutral. Ofcom's employees are not formally classified as civil servants, and their salaries are paid from Ofcom's budget, supported in part by fees and charges. Ballantyne Decl. ¶¶ 10, 15. On the other hand, Ofcom's senior leadership is appointed by government officials. *Id.* ¶¶ 5-6 (citing Ex. 1 § 1(2)-(5) & sched. ¶ 5(2)). And the Secretary of State sets the salaries and allowances for those members. *Id.* ¶ 8.

**Exclusive Rights**. "Ofcom is the sole public authority with responsibility for the regulatory functions that Parliament transferred to it in the 2003 Act." Ballantyne Decl. ¶ 19. This factor therefore favors organ status. *See Han*, 2019 WL 13253806, at *19 (exclusive right to "examin[e] . . . the business records from the financial institutions it regulates"); *Peninsula Asset Mgmt.*, 476 F.3d at 143 ("exclusive right to receive monthly business reports").

**Status Under Foreign Law**. This factor also favors organ status. Ofcom is a public authority under the UK's Freedom of Information Act and Public Records Act. Ballantyne Decl. ¶ 13 (citing Ex. 1 sched. ¶¶ 22-23). The UK Government lists Ofcom as one of 416 "[a]gencies and other public bodies" on its website. *Id.* ¶ 14 (citing Ex. 2). The UK Office of National Statistics classifies Ofcom as a "Central Government" body for accounting purposes. *Id.* ¶ 15 (citing Ex. 3). UK courts describe Ofcom as a public authority. *Id.* ¶ 16 (citing Exs. 4 & 5). And Ofcom's sponsoring ministry, the Department of Science, Innovation and Technology, considers Ofcom to be a public authority too. *Id.* ¶ 57 & Ex. 10.

Balancing those five factors, Ofcom clearly qualifies as an organ under *Filler*. *See, e.g.*, *Han*, 2019 WL 13253806, at *18-20 (finding financial regulator to be an "organ" based on similar balance of five factors).

### C.    Ofcom Is a Foreign State Entity Under *Lebron*

While the foregoing analysis is sufficient to resolve the issue, the Court could also draw guidance from *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374 (1995). In that case,

the Supreme Court held that Amtrak was a government entity for constitutional purposes even though its enabling statute disclaimed governmental status. *Id.* at 392-99. The Court held that "where . . . the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Government." *Id.* at 399; *see also Dep't of Transp. v. Ass'n of Am. R.R.s*, 575 U.S. 43, 55 (2015) (similar).

Ofcom is clearly governmental under *Lebron*. Parliament created Ofcom by special law. Ballantyne Decl. ¶4 & Ex. 1 § 1(1). Parliament created Ofcom to further governmental objectives. Ballantyne Decl. ¶20 & Ex. 6 § 3(1). And Parliament reserved to government officials authority to appoint Ofcom's chairman, all of Ofcom's non-executive members, and (indirectly) all of Ofcom's executive members. Ballantyne Decl. ¶¶5-6 (citing Ex. 1 § 1(2)-(5) & sched. ¶5(2)).

Although courts traditionally apply *Lebron* in domestic disputes, there is no good reason not to apply the test to foreign entities too. The *Lebron* factors are equally relevant in both settings. And if *Lebron* justifies treating a domestic entity as governmental even when Congress has affirmatively disclaimed that status, surely it justifies treating a foreign entity as governmental when that status fully aligns with the entity's treatment under foreign law. For those reasons, *Lebron* provides further support for treating Ofcom as a foreign state entity – whether as an organ or as a part of the state itself.

### D.    The Commercial Activity Exception Does Not Apply

If the Court agrees that Ofcom is a foreign state entity – either an organ or a part of the state itself – Ofcom is presumptively immune under Section 1604 of the FSIA. 28 U.S.C. § 1604. No exception to that immunity applies. Plaintiffs invoke the commercial activity exception. Compl. ¶¶44-45. But Ofcom's activities are regulatory rather than commercial in nature.

The FSIA's commercial activity exception applies when the "action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2). Each of those three prongs requires a "commercial activity." "The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d).

In *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607 (1992), the Court held that a "foreign sovereign's actions are 'commercial' within the meaning of the FSIA" when the "foreign government acts, not as regulator of a market, but in the manner of a private player within it." *Id.* at 614. "[T]he issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the ***type*** of actions by which a private party engages in 'trade and traffic or commerce.'" *Id.* "Thus, a foreign government's issuance of regulations limiting foreign currency exchange is a sovereign activity, because such authoritative control of commerce cannot be exercised by a private party; whereas a contract to buy army boots or even bullets is a 'commercial' activity, because private companies can similarly use sales contracts to acquire goods." *Id.* at 614-15.

Applying that standard, *Weltover* held that Argentina's issuance of government bonds was commercial activity because there was "nothing about the issuance of these [bonds] . . . that is not analogous to a private commercial transaction." 504 U.S. at 615-17. By contrast, in *Saudi Arabia v. Nelson*, 507 U.S. 349 (1993), the Court held that a foreign government's wrongful arrest, imprisonment, and torture of an employee was not a commercial activity, because "[e]xercise of the powers of police and penal officers is not the sort of action by which private parties can engage

in commerce." *Id.* at 361-62.  In *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27 (2015), the Court clarified that the commercial activity must constitute the "gravamen" of the suit and not merely an incidental element of the claim.  *Id.* at 35.

Applying those standards, Ofcom's activities are plainly sovereign rather than commercial. Plaintiffs accuse Ofcom of infringing their constitutional and statutory rights by seeking to *regulate* the internet services they offer – for example, by demanding information and imposing penalties for failure to comply – and by serving the legal process used to effect that regulation. Compl. ¶¶ 117-147.  Those are paradigmatic *regulatory* activities, not commercial ones.  Private parties do not regulate the conduct of other market participants by imposing compulsory regulatory obligations on them.  Those are quintessentially government functions.

*Weltover* itself repeatedly contrasts commercial activities with regulatory ones.  The Court held that a "foreign sovereign's actions are 'commercial' within the meaning of the FSIA" when the "foreign government acts, ***not as regulator of a market***, but in the manner of a private player within it."  504 U.S. at 614 (emphasis added).  "Thus, a foreign government's ***issuance of regulations limiting foreign currency exchange*** is a sovereign activity, because such authoritative control of commerce cannot be exercised by a private party . . . ."  *Id.* at 614-15 (emphasis added).

The D.C. Circuit has repeatedly applied that distinction.  In *Millen Industries, Inc. v. Coordination Council for North American Affairs*, 855 F.2d 879 (D.C. Cir. 1988), the court held that the "right to regulate imports and exports [is] a sovereign prerogative."  *Id.* at 885.  In *World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154 (D.C. Cir. 2002), the court had "no doubt that issuance of a license" was a "sovereign act."  *Id.* at 1165.  And in *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020 (D.C. Cir. 1997), the court held that administration of a government health program was "uniquely sovereign in nature."  *Id.* at 1030.

Many other cases reach similar results. *See, e.g.*, *Cmty. Fin. Grp., Inc. v. Republic of Kenya*, 663 F.3d 977, 981 (8th Cir. 2011) (decisions about "whether or how to investigate an allegedly fraudulent commercial transaction" and "regulate exports" were sovereign rather than commercial); *Anglo-Iberia Underwriting Mgmt. v. P.T. Jamsostek*, 600 F.3d 171, 178-79 (2d Cir. 2010) (monitoring compliance with social security program was sovereign); *Rush-Presbyterian-St. Luke's Med. Ctr. v. Hellenic Republic*, 877 F.2d 574, 578 (7th Cir. 1989) (same for license). In *Ryzhov v. Russian Federation*, No. 23-cv-2794, 2024 WL 81281 (D.D.C. Jan. 8, 2024), this Court found the commercial activity exception inapplicable where the plaintiff alleged that Russian prosecutors had tried to extort money from him, threatened criminal prosecution, and attempted to coerce him into divesting property. The commercial activity exception did not apply because the alleged acts "do not appear to be acts of a business entity in the private sector, and most, arguably, are the acts of a sovereign, even if the alleged acts amount to abuses of authority." *Id.* at *4. In short, "if an activity is one in which only a sovereign can engage, such as promulgating or enforcing regulations, even with regard to commercial activities, it is a noncommercial activity for purposes of the Foreign Sovereign Immunities Act." 14A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3662.3 (4th ed. rev. 2025).

Plaintiffs have no response. The Complaint includes statements like "[t]he Online Safety Act grants wide commercial powers to a corporation," "Ofcom's commercial policymaking purports to be compulsory," and "Ofcom is a commercial enterprise." Compl. ¶¶ 5, 40, 44. But the Complaint makes no serious attempt to explain how any of Ofcom's regulatory functions are "commercial" in the sense that *Weltover* and dozens of other cases use that term. Internet regulation, like any other regulation imposing compulsory obligations on regulated parties, is a sovereign activity, not a commercial one. The commercial activity exception does not apply.

## II.    THE COURT SHOULD DISMISS BASED ON FORUM NON CONVENIENS

Alternatively, the Court should dismiss this proceeding based on forum non conveniens. The common law forum non conveniens doctrine permits a court to dismiss a suit in favor of proceedings in a foreign forum. "A party seeking dismissal for *forum non conveniens* bears the burden of showing both (1) that an adequate alternative forum is available to hear the dispute, and (2) if so, that the balance of certain public and private interest factors strongly counsels in favor of trying the dispute in the alternative forum." *In re Air Crash over S. Indian Ocean on Mar. 8, 2014*, 946 F.3d 607, 612 (D.C. Cir. 2020); *see also Agudas Chasidei Chabad of U.S. v. Russian Federation*, 528 F.3d 934, 950 (D.C. Cir. 2008). Although there is a presumption in favor of the plaintiff's choice of forum, "[t]he *forum non conveniens* determination is committed to the sound discretion of the trial court." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 257 (1981).

The Court should dismiss this lawsuit in favor of proceedings in the UK. The UK courts provide an adequate forum to hear plaintiffs' claims. Section 168 of the Online Safety Act grants parties like 4chan a statutory right to seek judicial review of Ofcom's confirmation decision before the Upper Tribunal, a specialised judicial tribunal that handles administrative appeals. Ballantyne Decl. ¶ 37 & Ex. 8 § 168. The Upper Tribunal may quash Ofcom's decision and remit the case with whatever directions it considers appropriate, which could include the precise relief that plaintiffs seek. *Id.* Decisions of the Upper Tribunal may be further appealed to the Court of Appeal. *Id.* "Any suggestion that the English system of courts does not provide impartial tribunals or procedures compatible with the requirements of due process of law borders on the risible." *Society of Lloyd's v. Siemon-Netto*, 457 F.3d 94, 105 n.12 (D.C. Cir. 2006) (brackets omitted).

That UK courts may apply different substantive legal standards less favorable to plaintiffs is no reason to keep the case. "[A] change in substantive law should ordinarily not be given conclusive or even substantial weight in the *forum non conveniens* inquiry." *Piper Aircraft*, 454

U.S. at 247. "Where, as here, it appears undisputed that an alternative forum would provide a plaintiff at least some remedy, a district court acts within its discretion in deeming that forum an adequate alternative to a U.S. court." *In re Air Crash*, 946 F.3d at 613. The Upper Tribunal is fully capable of addressing whether plaintiffs' user-to-user services have sufficient "links with the United Kingdom" to justify Ofcom's efforts to protect the safety of UK users of those services, as well as any other challenges plaintiffs may wish to raise under applicable law.

The private and public interest factors support dismissal. The private interests include "the relative ease of access to sources of proof, the costs and procedural mechanisms required to secure the attendance of witnesses, and all other practical problems that make trial of a case easy, expeditious and inexpensive." *In re Air Crash*, 946 F.3d at 613 (quotation marks omitted). Those factors are a wash in this case because plaintiffs raise solely legal challenges to Ofcom's authority, which do not implicate the location of witnesses or documents. *See Ctr. for Envtl. Sci., Accuracy & Reliability v. Nat'l Park Serv.*, 75 F. Supp. 3d 353, 358 (D.D.C. 2014) (holding that "private interest factors regarding the convenience of the parties and witnesses, and the ease of access to proof, are largely irrelevant because the case will almost certainly be resolved as a matter of law"). Moreover, Ofcom's determination that 4chan has sufficient "links with the United Kingdom" to fall under the Online Safety Act was based on information from 4chan's own website and thus raises no concerns about the location of evidence. Ballantyne Decl. ¶¶ 40-42 & Ex. 9 at 35.

The public interest factors, by contrast, overwhelmingly favor proceeding in the UK. Those factors include "the local interest in having localized controversies decided at home and the desire to avoid requiring a court to untangle problems . . . in law foreign to itself." *In re Air Crash*, 946 F.3d at 613 (quotation marks omitted). This case involves a UK public regulatory authority's efforts to ensure the safety of UK internet users under UK online safety legislation. The United Kingdom has a paramount interest in enforcing its own safety measures to protect its own residents

through its own regulatory processes. *See MBI Grp., Inc. v. Credit Foncier du Cameroun*, 558 F. Supp. 2d 21, 34-35 (D.D.C. 2008) (public interest factors favored dismissal because "Cameroon plainly has a strong interest at stake in this litigation" involving "an affordable housing project of national concern" to Cameroon); *Croesus EMTR Master Fund L.P. v. Federative Republic of Brazil*, 212 F. Supp. 2d 30, 39-40 (D.D.C. 2002) (public interest factors weighed "heavily in favor of a Brazilian forum" because allegations implicated "the fiscal structure and monetary policy of Brazil"). As noted, the UK's regulatory processes include ample opportunity for parties to dispute the Online Safety Act's application to them based on their lack of connections to the UK or otherwise, either by raising those issues before Ofcom or by seeking judicial review.

Even in the domestic context, U.S. courts normally permit administrative proceedings to run their course and require parties aggrieved by agency action to pursue relief through the statutory review scheme rather than by suing the regulator in federal court. *See, e.g.*, *Elgin v. Dep't of Treasury*, 567 U.S. 1, 8-23 (2012); *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207-16 (1994). Those same considerations apply here. If plaintiffs have complaints about Ofcom's assertion of authority or the manner in which Ofcom conducts its proceedings, they may pursue those complaints through the judicial review mechanism Parliament created. For that reason too, the United Kingdom has a compelling public interest in resolving this matter through its own legislatively prescribed processes.

## III. THE COURT SHOULD DISMISS BASED ON INTERNATIONAL COMITY

For similar reasons, the Court should dismiss this suit on the basis of international comity. Comity is "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation." *Hilton v. Guyot*, 159 U.S. 113, 164 (1895). It is the "golden rule among nations – that each must give the respect to the laws, policies and interests of others

that it would have others give to its own in the same or similar circumstances." *United States v. One Gulfstream G-V Jet Aircraft*, 941 F. Supp. 2d 1, 8 (D.D.C. 2013).

The branch of the doctrine relevant here is "adjudicative comity" – *i.e.*, "deference to foreign tribunals." *Usoyan v. Republic of Turkey*, 6 F.4th 31, 48 (D.C. Cir. 2021) (quoting William S. Dodge, *International Comity in American Law*, 115 Colum. L. Rev. 2071, 2078 (2015)). To invoke adjudicative comity, a party "must either point to a legal proceeding" underway in another country or "at least the availability of effective and non-futile local remedies." *Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 64 (D.C. Cir. 2011), *vacated on other grounds*, 527 F. App'x 7 (D.C. Cir. 2013); *see also One Gulfstream*, 941 F. Supp. 2d at 9 ("A defendant invoking the doctrine of comity must either point to a valid legal proceeding to which the court must defer; or at the very least, the defendant must demonstrate that some alternate forum would be adequate."). "[C]ourts most often dismiss cases on principles of comity where there is . . . a pending proceeding which could provide an alternative remedy." *Kurd v. Republic of Turkey*, 438 F. Supp. 3d 69, 92 (D.D.C. 2020), *aff'd*, 6 F.4th 31 (D.C. Cir. 2021).

Those comity principles apply squarely here. Ofcom has brought enforcement proceedings against 4chan, and those proceedings remain ongoing. Rather than pursue its objections through the statutory processes provided, 4chan brought this collateral challenge in U.S. court to derail the proceedings. 4chan has not alleged – and could not allege – that it would be futile to seek relief abroad. The statute provides ample means for it to do so. Due respect for a foreign nation's regulatory processes requires dismissal of this collateral challenge.

## IV.    KIWI FARMS CANNOT SHOW STANDING OR RIPENESS

Finally, Kiwi Farms's claims should be dismissed for lack of standing and ripeness. To establish standing, a plaintiff must show an injury that is "actual or imminent" rather than "conjectural" or "hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992); *Sabre, Inc.*

*v. U.S. Dep't of Transp.*, 429 F.3d 1113, 1117 (D.C. Cir. 2005).  That requirement precludes standing where a plaintiff challenges potential future actions that an agency may or may not take. "Although a plaintiff requesting preenforcement review is not required to expose [it]self to liability before bringing suit to challenge the basis for an enforcement action by the government, [it] must nevertheless demonstrate that either the threatened enforcement injury is ***certainly impending*** or there is a ***substantial risk*** such injury will occur." *Hemp Indus. Ass'n v. DEA*, 36 F.4th 278, 290 (D.C. Cir. 2022) (emphasis added) (citations and quotation marks omitted); *see also Matthew A. Goldstein, PLLC v. U.S. Dep't of State*, 851 F.3d 1, 5 (D.C. Cir. 2017) (no standing where agency "has shown no intention of enforcing the . . . regulations against [plaintiff]"); *New England Power Generators Ass'n, Inc. v. FERC*, 707 F.3d 364, 369 (D.C. Cir. 2013).

The ripeness doctrine imposes similar constraints.  "[T]he doctrine of ripeness serves . . . 'to protect . . . agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Aulenback, Inc. v. Fed. Highway Admin.*, 103 F.3d 156, 166 (D.C. Cir. 1997).  A plaintiff cannot show ripeness merely by "positing a speculative or hypothetical future harm." *Nat. Res. Def. Council, Inc. v. EPA*, 859 F.2d 156, 166 (D.C. Cir. 1988).

Kiwi Farms fails those tests.  Ofcom has not sent any information notice to Kiwi Farms, has not opened any investigation into Kiwi Farms's compliance with the Act, has not issued any provisional notice of contravention to Kiwi Farms, has not issued any confirmation decision to Kiwi Farms, and has not imposed any penalties on Kiwi Farms.  Ballantyne Decl. ¶ 55.  Instead, Ofcom sent one letter on March 26, 2025, offering an introductory meeting and stating that it planned to send an information notice at a later date.  *Id.* ¶ 50.  Ofcom then sent a second letter on April 29, stating that it had changed its mind and did not plan to send the information notice after all, because Kiwi Farms had blocked access to users with UK-based IP addresses.  *Id.* ¶ 52.  In

July, Ofcom exchanged emails with Kiwi Farms's counsel about the IP blocking feature being down for maintenance, but Kiwi Farms's counsel reassured Ofcom that "[o]nce it is back up, my client will, in all probability, restore the nation-level block of the UK." *Id.* ¶¶ 53-54.

Those events preclude Kiwi Farms's claims. Even assuming that Kiwi Farms has decided not to restore its IP block after all (contrary to what it told Ofcom), *cf.* Compl. ¶ 104, the injuries that Kiwi Farms claims are entirely speculative. Whether Ofcom will ultimately determine that Kiwi Farms falls within the Act's coverage and what actions, if any, Ofcom might take as a result remain unknown at this point. Kiwi Farms's claimed injuries are conjectural and hypothetical, so Kiwi Farms cannot show either the standing or the ripeness required to sue.

## **CONCLUSION**

The Court should grant Ofcom's motion and dismiss plaintiffs' suit in its entirety.


Dated:    December 1, 2025                           Respectfully submitted,
          Washington, D.C.


                                                       /s/ Robert K. Kry
                                                     Robert K. Kry
                                                     D.C. Bar # 490545
                                                     Christian I. Bale
                                                     D.C. Bar # 90020099
                                                     MOLO LAMKEN LLP
                                                     The Watergate, Suite 500
                                                     600 New Hampshire Avenue, N.W.
                                                     Washington, D.C.  20037
                                                     (202) 556-2011
                                                     rkry@mololamken.com

                                                     *Attorneys for the UK Office of*
                                                     *Communications, a/k/a Ofcom*