UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| 4CHAN COMMUNITY SUPPORT LLC; and LOLCOW, LLC, d/b/a KIWI FARMS,<br><br>Plaintiffs,<br><br>v.<br><br>THE UK OFFICE OF COMMUNICATIONS, a/k/a OFCOM,<br><br>Defendant. | Case No. 1:25-cv-02880-RC |

## DECLARATION OF MARTIN RALPH BALLANTYNE

MARTIN RALPH BALLANTYNE declares as follows pursuant to 28 U.S.C. § 1746:

1. I am the General Counsel and Legal Group Director of the UK Office of Communications, a/k/a Ofcom, the defendant in the above-captioned action. I have been General Counsel of Ofcom since 2020 and a Legal Director in Ofcom's Legal Group since 2012. I provide advice on all policy areas within Ofcom's jurisdiction. I hold a law degree from the University of Exeter and was admitted as a solicitor in England and Wales in 2001. Before joining Ofcom's legal team in 2007, I practiced at a prominent law firm in London for several years. I submit this declaration in support of Ofcom's motion to dismiss the complaint in this action. The following statements are based on my personal knowledge with respect to Ofcom's structure and operations and my familiarity with the applicable governing laws of the United Kingdom as a result of my legal training and work at Ofcom.

2. Ofcom is the UK's independent communications regulator. Ofcom's regulatory jurisdiction includes fixed-line and mobile telecommunications, television and radio

broadcasting, the postal service, the radio spectrum used by wireless devices, and online safety. Ofcom also has concurrent responsibility with the UK Competition and Markets Authority for enforcing UK competition and consumer laws in relation to communications markets. Ofcom's powers include enforcing prohibitions on anticompetitive agreements and the abuse of dominant positions as well as investigating markets and referring matters to the UK Competition and Markets Authority. Below, I describe Ofcom's structure and oversight, its regulatory responsibilities under the Online Safety Act 2023, and its interactions with the two plaintiffs in this case.

*Ofcom's Structure and Oversight*

3.     Ofcom is a creature of statute. Parliament established Ofcom in 2002 by enacting the Office of Communications Act 2002. A true and correct copy of that Act and its Schedule, as amended, is attached as **Exhibit 1**.[1]

4.     Section 1(1) of the 2002 Act establishes Ofcom as a statutory corporation, meaning that Ofcom's powers, functions, and duties derive from legislation enacted by Parliament. As a corporate entity, Ofcom has separate legal personality from the UK Government and the capacity to sue and be sued in its own name. Statutory corporations like Ofcom are created by specific acts of Parliament, unlike private business corporations that are created by shareholders under the Companies Act 2006. Also unlike a private business corporation, Ofcom has no share capital or shareholders. The powers, functions, and duties granted to Ofcom by applicable legislation are all regulatory in nature.

---

[1] All legislation cited and attached to this declaration is reproduced from the National Archives' official website at legislation.gov.uk, and includes amendments reflected on that website as of November 13, 2025.

5.      Ofcom's governance structure and organisation are set out in Section 1 and the Schedule of the 2002 Act. Under that statute, Ofcom's chairman and all non-executive members of Ofcom's governing board are appointed by government ministers, principally the Secretary of State. The "Secretary of State" for these purposes is the Secretary of State for Ofcom's sponsoring ministry, currently the Department of Science, Innovation and Technology ("DSIT"). Section 1(2) of the Act provides that "OFCOM shall consist of such number of members as the Secretary of State may determine," between three and thirteen. Section 1(3) authorizes the Secretary of State to appoint Ofcom's chairman and most of its other non-executive members, while ministers of the devolved governments of Scotland, Wales, and Northern Ireland appoint one non-executive member each in consultation with the Secretary of State.

6.      Under Paragraph 5(2) of the Schedule to the 2002 Act, Ofcom's chairman and non-executive members, with approval by the Secretary of State, appoint Ofcom's chief executive. Under Sections 1(4) and 1(5) of the Act, Ofcom's chairman and non-executive members, after consultation with the chief executive, appoint Ofcom's executive members. Ofcom's members collectively constitute the board, which provides strategic direction. Ofcom's chief executive manages Ofcom's day-to-day operations, while Ofcom's executive members help run the organisation.

7.      Paragraph 2(4) of the Schedule permits the Secretary of State to remove Ofcom's chairman or other non-executive members for misbehaviour and other specified causes.

8.      Paragraph 3(1) permits the Secretary of State to set the compensation and allowances for Ofcom's chairman and other non-executive members.

9.      Paragraph 8(1) requires Ofcom to balance its expenditures with its revenues. Under Paragraph 8(2), any excess revenues for any financial year must be applied as the

Secretary of State, after consultation with Ofcom, may direct. The UK Government establishes caps on Ofcom's spending through its periodic Spending Reviews.

10. Ofcom's work is funded in part by licence fees and administrative charges imposed on regulated persons. Those fees and charges include fees for broadcast licenses and administrative charges for providing electronic communications networks and services. By agreement with His Majesty's Treasury and the Secretary of State, Ofcom also retains certain fees it collects from managing the UK's radio spectrum under the Wireless Telegraphy Act 2006 to cover the costs of functions for which it does not otherwise have authority to impose fees or charges. On occasion, Ofcom also receives "grants in aid" from its sponsoring ministry, DSIT.

11. Paragraph 11 of the Schedule requires Ofcom to send a statement of accounts for each financial year to the Secretary of State as well as the National Audit Office's Comptroller and Auditor General for submission to each House of Parliament.

12. Paragraph 12 requires Ofcom to prepare and send to the Secretary of State and the devolved ministers an annual report on its functions carried out each year. The Secretary of State then submits a copy to each House of Parliament in Westminster. Ofcom's annual report is also submitted to the Scottish Parliament, the Welsh Parliament, and the Northern Ireland Assembly.

13. Paragraphs 22 and 23 state that Ofcom is a public authority for purposes of the Freedom of Information Act 2000 and that Ofcom's records are public records for purposes of the Public Records Act 1958.

14. The UK Government classifies Ofcom as a public entity. The UK Government maintains a website at www.gov.uk/government/organisations that lists "[d]epartments, agencies and public bodies." That list identifies Ofcom as one of 416 "[a]gencies and other public bodies." A true and correct copy of excerpts from that website is attached as **Exhibit 2**.

15. The UK Office of National Statistics, which defines the UK's "public sector" for accounting purposes, similarly classifies Ofcom as a public entity. The Office of National Statistics categorizes Ofcom as a "Central Government" body on the ground that "Ofcom is and always has been a non-market body" and is considered "a Central Government unit from its creation." A copy of the relevant entry from the Organisation / Unit tab of the Office of National Statistics's Public Sector Classification Guide spreadsheet, obtained from the Office's website at www.ons.gov.uk/methodology/classificationsandstandards/economicstatisticsclassifications/introductiontoeconomicstatisticsclassifications, is attached as **Exhibit 3**.

16. English courts have recognised Ofcom's status as a public authority for purposes of the Human Rights Act 1998. For example, in *GB News Limited v. Ofcom*, [2025] EWHC 460 (Admin), ¶4, the High Court stated: "As a public authority, compliance with Article 10 [of the European Convention on Human Rights] is legally binding on OFCOM in the exercise of its functions." And in *Wikimedia Foundation v. Secretary of State for Science, Innovation & Technology*, [2025] EWHC 2086 (Admin), ¶136, the High Court recognised that a decision by Ofcom categorising a regulated service provider "is a public law decision which is potentially amenable to the court's review on grounds of public law error (including incompatibility with a Convention right)." True and correct copies of excerpts from those decisions are attached as **Exhibits 4 and 5**.

17. Despite Ofcom's status as a public entity and regulator, Ofcom is not considered a Crown entity (e.g., a department or ministry exercising functions on behalf of the Crown), and Ofcom's employees are not civil servants. Section 1(9) of the 2002 Act states that "Ofcom shall not be treated for any purposes as a body exercising functions on behalf of the Crown, and accordingly, no person shall be treated as a servant of the Crown by reason only of his membership of, or employment by, OFCOM."

18. The main legislation governing Ofcom's regulatory responsibilities is the Communications Act 2003. A true and correct copy of excerpts from that Act and its Schedule 1, as amended, is attached as **Exhibit 6**.

19. The 2003 Act transferred to Ofcom various regulatory responsibilities in the communications sector previously exercised by (1) the Independent Television Commission; (2) the Radio Authority; (3) the Broadcasting Standards Commission; (4) the Director General of Telecommunications; and (5) the Secretary of State, who formerly had a regulatory role through the Radiocommunications Agency. Ofcom is the sole public authority with responsibility for the regulatory functions that Parliament transferred to it in the 2003 Act.

20. Section 3(1) of the 2003 Act, titled "General duties of OFCOM," states: "It shall be the principal duty of OFCOM, in carrying out their functions – (a) to further the interests of citizens in relation to communications matters; and (b) to further the interests of consumers in relevant markets, where appropriate by promoting competition." Under Section 3(3) of that Act, "[i]n performing their duties under subsection (1), OFCOM must have regard, in all cases, to – (a) the principles under which regulatory activities should be transparent, accountable, proportionate, consistent and targeted only at cases in which action is needed; and (b) any other principles appearing to OFCOM to represent the best regulatory practice."

21. Parliament has subsequently expanded Ofcom's regulatory responsibilities through other legislation. Examples include the Telecommunications (Security) Act 2021 and the Online Safety Act 2023, discussed below.

22. Ofcom describes its regulatory operations each year in the Annual Report and Accounts it submits pursuant to Paragraphs 11 and 12 of Schedule 1 to the Office of Communications Act 2002. A true and correct copy of an excerpt from Ofcom's 2024-2025 Annual Report and Accounts is attached as **Exhibit 7**.

*Ofcom's Responsibilities Under the Online Safety Act*

23. In 2023, Parliament enacted the Online Safety Act 2023. A true and correct copy of excerpts from that Act and its Schedule 13, as amended, is attached as **Exhibit 8**.

24. According to Section 1, the 2023 Act's central policy objective is to make the use of internet services safer for individuals in the UK, particularly children.

25. Under Section 4(2), the Act applies to certain internet services, including "user-to-user services," if those services have "links with the United Kingdom" and are not exempted from the Act. Under Section 3(1), a "user-to-user service" is an internet service by which content that is generated, uploaded, or shared by one user may be encountered by other users. Section 204(1) makes clear that user-to-user services include both services provided from within the United Kingdom and services provided from outside the United Kingdom. Under Sections 4(5) and 4(6), however, a user-to-user service has "links with the United Kingdom" so as to fall within the Act's coverage only if (1) "the service has a significant number of United Kingdom users"; (2) "United Kingdom users form one of the target markets for the service (or the only target market)"; or (3) "the service is capable of being used in the United Kingdom by individuals" and "there are reasonable grounds to believe that there is a material risk of significant harm to individuals in the United Kingdom presented by . . . user-generated content present on the service." Under Section 227(1), a "United Kingdom user" is an individual in the United Kingdom or an entity formed under UK law.

26. The 2023 Act imposes duties of care on providers of user-to-user internet services with respect to certain illegal content on their platforms, such as content relating to terrorism or child sexual exploitation and abuse. Section 9 requires service providers to conduct an illegal content risk assessment that evaluates the risk that users may encounter illegal content on the service and the risk that the service may be used to commit or facilitate an offence. The

7

assessment must also evaluate, among other things, the nature and severity of the harm that might be suffered by individuals in the United Kingdom. Section 10 imposes further duties on providers of user-to-user services, including a duty to take proportionate measures to prevent individuals in the UK from encountering certain illegal content and to mitigate and manage the risk of the service being used to commit or facilitate certain offences.

27. Under Section 8(3) of the Act, those duties apply only to "the design, operation and use of the service in the United Kingdom" and "the design, operation and use of the service as it affects United Kingdom users of the service." In other words, the Act's illegal content provisions impose no duties on foreign service providers except with respect to the design, operation, and use of their service in the UK and to the extent their service affects UK users.

28. The 2023 Act appointed Ofcom as the UK's regulator for online safety. Section 91(2) added Section 3(2)(g) to the Communications Act 2003, which directs Ofcom to secure "adequate protection of citizens from harm presented by content on regulated services, through the appropriate use by providers of such services of systems and processes designed to reduce the risk of such harm."

29. The 2023 Act grants Ofcom various powers to fulfill that regulatory mandate. Section 41 requires Ofcom to prepare and issue codes of practice for regulated internet services setting out measures recommended for compliance with certain duties of care in the Act, including those relating to illegal content and children's online safety. Under Section 43, Ofcom submits those codes to the Secretary of State, who then provides them to Parliament. Section 85 authorizes Ofcom to make regulations about how to determine a regulated service's "qualifying worldwide revenue," a metric used to set fees and penalties.

30. Section 100 empowers Ofcom to gather information it needs to carry out its regulatory responsibilities. Specifically, Ofcom may serve notices requiring service providers or

third parties to provide information that Ofcom needs in order to exercise or decide whether to exercise any of its online safety functions. Under Section 204(2), that authority applies whether the documents are held inside or outside the UK. Section 208(2) permits Ofcom to serve information notices by various means, including email.

31. Section 102(8) requires a person receiving an information notice to act in accordance with the requirements of the notice when responding and to ensure that the information provided is accurate in all material respects. Under Section 109, failure to comply with an information notice may be prosecuted as an offence. Before sending a statutory information notice, Ofcom may engage informally with a regulated entity.

32. Section 105 authorizes Ofcom to conduct investigations to determine whether a service provider has failed or is failing to comply with enforceable requirements in the Act. Section 106 permits Ofcom to interview a service provider's officers or employees.

33. Section 130 permits Ofcom to issue a provisional notice of contravention if Ofcom determines that there are reasonable grounds for believing that a service provider has failed or is failing to comply with enforceable requirements in the Act. The service provider has an opportunity to make representations in response to the notice and to provide any supporting evidence.

34. If, after considering any response, Ofcom is still satisfied that the service provider has failed or is failing to comply, Sections 132 to 137 permit Ofcom to issue a confirmation decision imposing compliance requirements and/or financial penalties.

35. Under Section 137, Ofcom may impose penalties for failure to comply, including one-time and/or daily financial penalties. Paragraph 4(1) of Schedule 13 to the Act caps any financial penalty at the greater of £18 million or 10% the service provider's qualifying

worldwide revenue for the most recent accounting period. Any penalties Ofcom recovers are paid into the UK Government's consolidated fund.

36. The 2023 Act does not grant Ofcom any power to censor content. Sections 144 to 148 allow Ofcom to apply to a UK court for "business disruption measures," which are court orders requiring third parties (such as search engines, ad servers, or internet service providers) to take steps to disrupt the business of a non-compliant regulated service provider and thereby reduce the risk of harm to UK users. Any such court order must be limited, so far as possible, to measures "relating to the operation of the relevant service as it affects United Kingdom users" or "that impede the access of United Kingdom users."

37. Section 168 of the Act provides for judicial review of Ofcom's confirmation decisions and penalty notices in the UK courts. The service provider that is the subject of the decision, or any other person with a sufficient interest in the decision, may appeal to the Upper Tribunal, a specialised judicial tribunal that handles certain administrative appeals. The Upper Tribunal must decide the appeal by applying the same principles as would be applied by the High Court on an application for judicial review of a public law decision. The Upper Tribunal may either dismiss the appeal or quash the decision and remit the matter to Ofcom with such directions as the Upper Tribunal considers appropriate. Decisions of the Upper Tribunal may be appealed to the Court of Appeal.

*Ofcom's Interactions with Plaintiffs*

38. As part of Ofcom's efforts to promote compliance with the Online Safety Act 2023, Ofcom sought to engage with service providers before those duties came into effect. Two of those service providers were plaintiffs 4chan Community Support LLC ("4chan") and Lolcow, LLC, d/b/a Kiwi Farms ("Kiwi Farms").

39. As noted above, the Online Safety Act 2023 requires user-to-user internet services to comply with the Act's obligations, regardless of where the service provider is headquartered, if "the service has a significant number of United Kingdom users" or if "United Kingdom users form one of the target markets for the service (or the only target market)."

40. Applying that statutory test, Ofcom determined that 4chan was subject to the Act. The 4chan.org website states that 4chan has over 20 million unique visitors per month and that over 7% of 4chan's user base is UK users. Ofcom determined that a UK user base of hundreds of thousands of persons is a "significant number" within the meaning of Section 4(5)(a) of the Act.

41. In addition, the advertising section of the 4chan.org website markets the platform to advertisers on the basis that 7% of its users are from the UK, the second largest percentage behind the United States. Based on that information, Ofcom determined that the UK "form[s] one of the target markets" for 4chan's service within the meaning of Section 4(5)(b) of the Act.

42. Because 4chan reports a significant number of UK users and identifies the UK as one of its target markets, Ofcom determined that 4chan has the requisite links with the United Kingdom to fall within the scope of the Act.

43. On March 27, 2025, Ofcom contacted 4chan by email, offering an introductory meeting and informing 4chan that Ofcom believed 4chan to be subject to the Act. On April 8, 2025, Ofcom contacted 4chan again to reiterate its offer of a meeting. Ofcom did not receive a response to either email.

44. On April 14, 2025, Ofcom sent an information notice to 4chan seeking a written record of the illegal content risk assessment that 4chan was required to prepare under the Act. On June 10, 2025, Ofcom opened an investigation into 4chan's compliance. On June 16, 2025,

Ofcom sent a second information notice to 4chan, seeking information about 4chan's qualifying worldwide revenues as relevant to any potential penalties under the Act.

45. On August 12, 2025, Ofcom issued a provisional notice of contravention to 4chan, finding that 4chan had failed to comply with its obligation under Section 102(8) of the Act to provide the information required by the two notices.

46. On August 16, 2025, 4chan's counsel informed Ofcom that 4chan was an American company with no establishment, assets, or operations in the United Kingdom, and referenced the protections of the First Amendment to the U.S. Constitution. 4chan's counsel also objected that Ofcom had not invoked the procedures set out in the Mutual Legal Assistance Treaty between the UK and the US when serving documents on 4chan.

47. On October 13, 2025, Ofcom sent a confirmation decision to 4chan adhering to the findings made in its provisional notice of contravention. 4chan's counsel responded on October 14, stating: "Thank you for the several dozen pages of, in America, legally void correspondence. It will make excellent bedding for my pet hamster."

48. On November 18, 2025, Ofcom published a non-confidential version of the confirmation decision. A true and correct copy of the decision is attached as **Exhibit 9**. The confirmation decision requires 4chan to comply with the two information notices and imposes a fixed penalty of £20,000 on 4chan for its failure to comply, as well as a daily rate penalty of £100 per day starting October 14, 2025, up to a maximum of 60 days, for its continued failure to comply. As noted above, 4chan has the right to appeal that decision to the Upper Tribunal in the UK.

49. Ofcom similarly determined that plaintiff Kiwi Farms was likely to fall within the scope of the Act as a provider of a user-to-user service that was available to UK users.

50. On March 26, 2025, Ofcom sent a letter to Kiwi Farms by email (addressed to 1776 Solutions LLC), offering an introductory meeting and informing Kiwi Farms that Ofcom considered it likely that Kiwi Farms was subject to the Act. Ofcom explained that the illegal content duties under the Act were now in effect and advised Kiwi Farms to expect an information notice on or around April 3, 2025, seeking a written record of Kiwi Farms's illegal content risk assessment relating to the service.

51. On March 31, 2025, Kiwi Farms responded to that letter through counsel, disputing Ofcom's authority.

52. On April 29, 2025, Ofcom responded to note that Kiwi Farms had blocked IP addresses in the United Kingdom from accessing the service and that, taking this development into account, Ofcom had decided not to proceed with issuing an information notice requesting a written record of Kiwi Farms's illegal content risk assessment. Ofcom reserved the right to revisit this approach in the future.

53. On or around July 22 or 23, 2025, Kiwi Farms's website appeared to have become accessible again to UK users. Accordingly, on July 25, 2025, Ofcom sent an email to Kiwi Farms's counsel, noting this development and requesting clarification of whether Kiwi Farms intended to reinstate its previous restrictions on access for UK users. Ofcom also requested details of the measures Kiwi Farms had taken, or planned to take, to ensure compliance with the Act.

54. On July 25, 2025, Kiwi Farms responded, again through counsel, asserting that Ofcom was required to use the US-UK Mutual Legal Assistance Treaty to serve documents on Kiwi Farms and invoking its First Amendment rights. The email stated that "the IP blocking feature is currently down for maintenance" and that, "[o]nce it is back up, my client will, in all probability, restore the nation-level block of the UK."

55. As of the present date, Ofcom has not sent any information notice to Kiwi Farms, has not opened any investigation into Kiwi Farms's compliance with the Act, has not issued any provisional notice of contravention to Kiwi Farms, has not issued any confirmation decision with respect to Kiwi Farms, and has not imposed any penalties on Kiwi Farms.

*This Lawsuit*

56. On August 27, 2025, 4chan and Kiwi Farms filed this action against Ofcom, seeking a declaratory judgment that Ofcom's efforts to serve them were ineffective and that Ofcom's two information notices to 4chan and correspondence to Kiwi Farms violated various constitutional and statutory provisions of United States law. The complaint also seeks permanent injunctive relief.

57. In connection with this matter, Ofcom solicited DSIT's opinion on Ofcom's status as a public authority. A true and correct copy of DSIT's response is attached as **Exhibit 10**.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on December 1, 2025.
London, England

_____
Martin Ralph Ballantyne