**EXHIBIT 4**



Neutral Citation Number: [2025] EWHC 460 (Admin)

Case No: AC-LON-2024-002150

**IN THE HIGH COURT OF JUSTICE**
**ADMINISTRATIVE COURT**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 28/02/2025

**Before** :

**THE HONOURABLE MRS JUSTICE COLLINS RICE DBE CB**

- - - - - - - - - - - - - - - - - - - - -

**Between :**

**The King**
**on the application of**

**GB NEWS LIMITED**                                                  **Claimant**

**– and –**

**THE OFFICE OF COMMUNICATIONS**
**('OFCOM')**                                                        **Defendant**

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Mr Tom Hickman KC** & **Mr Christopher Knight** (instructed by Brown Rudnick LLP) for the **Claimant**
**Miss Jessica Boyd KC**, **Mr David Glen** & **Mr Rowan Stennett** (instructed by OFCOM) for the **Defendant**

Hearing dates: 29th & 30th January 2025
- - - - - - - - - - - - - - - - - - - - -

## Approved Judgment

This judgment was handed down remotely at 12pm on 28 February 2025 by circulation to the parties or their representatives by e-mail and by release to the National Archives.

.............................

THE HONOURABLE MRS JUSTICE COLLINS RICE DBE CB

**Mrs Justice Collins Rice :**

# Introduction

1. GB News is a UK free-to-air television and radio news channel. Launched in the summer of 2021, it was the first new entrant into the TV news and current affairs arena for more than thirty years. Its editorial charter says:

   > **We are pioneers** – leading the charge for a new kind of journalism. One that refuses to bow to convention or be swayed by those who shout loudest. We are here for everyone, not the establishment, nor just for popular opinion. We believe in elevating the unheard, giving them a platform, and creating a space where every voice is respected, valued, and heard. **This is journalism for the people, by the people**.

   One of its points of distinctiveness has been hiring prominent politicians still active on the national stage to host their own topical discussion programmes. Current Reform UK Party leader Nigel Farage was given a prime-time show shortly after the launch, and Dehenna Davison, Lee Anderson, Esther McVey and Philip Davies have all had presenting roles while sitting as Conservative MPs. Former Conservative Cabinet Minister Jacob Rees-Mogg (now Sir Jacob) joined the broadcaster in 2023, on return to the backbenches, to present a regular topical discussion show, *Jacob Rees-Mogg's State of the Nation*, airing four times a week for an hour.

2. TV broadcasting is subject to statutory regulation, overseen by broadcast regulator OFCOM. On receipt of a number of complaints, and after further investigation and procedure, OFCOM issued decisions on 18th March 2024 that two editions of *Jacob Rees-Mogg's State of the Nation* – broadcast on 9th May 2023 and 13th June 2023 – breached rules in its Broadcasting Code.

3. GB News challenges those decisions in these Judicial Review proceedings. The parties agree the challenge requires determination of a point of law about the interpretation of the Broadcasting Code's provisions relating to '*due impartiality and due accuracy in news*'.

# Legal framework

*(a)   Article 10 ECHR*

4. Freedom of expression is a fundamental right. It currently has force in UK law through the Human Rights Act 1998, which enshrines Article 10 of the European Convention on Human Rights. As a public authority, compliance with Article 10 is legally binding on OFCOM in the exercise of its functions.

5. Article 10 provides as follows:

   > **Freedom of expression**

> 1. Everyone has the right to freedom of expression. This right shall include freedom to hold opinions and to receive and impart information and ideas without interference by public authority and regardless of frontiers. This Article shall not prevent States from requiring the licensing of broadcasting, television or cinema enterprises.
>
> 2. The exercise of these freedoms, since it carries with it duties and responsibilities, may be subject to such formalities, conditions, restrictions or penalties as are prescribed by law and are necessary in a democratic society, in the interests of national security, territorial integrity or public safety, for the prevention of disorder or crime, for the protection of health or morals, for the protection of the reputation or rights of others, for preventing the disclosure of information received in confidence, or for maintaining the authority and impartiality of the judiciary.

6. Freedom of journalistic expression – including editorial freedom – is an especially important exercise of the right, fundamental to any democracy. Significantly, Art.10(1) expressly confirms that is compatible with having broadcast licensing regimes, because they are a form of intrusion into the freedom of journalistic expression. As such, Art.10(2) requires broadcasting regulation to be, among other things, '*prescribed by law*'.

7. The decided caselaw provides guidance about what that means in practice. The law in question must be sufficiently clear, predictable and foreseeable in application. The ECtHR emphasises that particularly where restraint of journalism is concerned: '*…the relevant law must provide a clear indication of the circumstances when such restraints are permissible and, a fortiori, when the consequences of the restraint are to block publication of a periodical completely, as in the present case.*' (<u>Gaweda v Poland (2004) 39 E.H.R.R. 4</u>, at [40]).

8. But these standards are subject to reasonableness and practicality. Lord Sumption put it this way in <u>R (Catt) v Association of Chief Police Officers of England, Wales and Northern Ireland & Anor</u> [2015] AC 1065 (at [11]):

   > … the rules need not be statutory, provided that they operate within a framework of law and that there are effective means of enforcing them. Their application, including the manner in which any discretion will be exercised, should be reasonably predictable, if necessary with the assistance of expert advice. But except perhaps in the simplest cases, this does not mean that the law has to codify the answers to every possible issue which may arise. It is enough that it lays down principles which are capable of being predictably applied to any situation.

9. And the ECtHR in <u>Satakunnan v Finland (2018) 66 EHRR 8</u> held, at [143]:

   > As regards the requirement of foreseeability, the Court has repeatedly held that a norm cannot be regarded as a "law" within the meaning of art.10(2) unless it is formulated with sufficient

> precision to enable a person to regulate his or her conduct. That person must be able—if need be with appropriate advice—to foresee, to a degree that is reasonable in the circumstances, the consequences which a given action may entail. Those consequences need not be foreseeable with absolute certainty. Whilst certainty is desirable, it may bring in its train excessive rigidity, and the law must be able to keep pace with changing circumstances. Accordingly, many laws are inevitably couched in terms which, to a greater or lesser extent, are vague, and whose interpretation and application are questions of practice.

Again, at [145], regarding the standard as applied to professionals:

> The Court has found that persons carrying on a professional activity, who are used to having to proceed with a high degree of caution when pursuing their occupation, can on this account be expected to take special care in assessing the risks that such activity entails.

10. So foreseeability reasonable in the circumstances is consistent with an element of flexibility, interpretation and adaptation over time. In *S.W. v United Kingdom (Application no.20166/92), 22 November 1995*, the ECtHR said this, in the context of criminal law (at [36]):

> However clearly drafted a legal provision may be, in any system of law, including criminal law, there is an inevitable element of judicial interpretation. There will always be a need for elucidation of doubtful points and for adaptation to changing circumstances. Indeed, in the United Kingdom, as in the other Convention States, the progressive development of the criminal law through judicial law-making is a well-entrenched and necessary part of legal tradition. Article 7 of the Convention cannot be read as outlawing the gradual clarification of the rules of criminal liability through judicial interpretation from case to case, provided that the resultant development is consistent with the essence of the offence and could reasonably be foreseen.

11. The ECtHR in *Huhtamäki v. Finland (App. No. 54468/09; 6 March 2012)*, again in the context of criminal law, observed in the same vein that (at [51]):

> Article 7 of the Convention cannot be read as outlawing the gradual clarification of the rules of criminal liability through judicial interpretation from case to case, provided that the resultant development is consistent with the essence of the offence and could reasonably be foreseen… Even when a point is ruled upon for the first time in an applicant's case, a violation of Article 7 of the Convention will not arise if the meaning given is both foreseeable and consistent with the essence of the offence…

12. Expanding on this in <u>Perinçek v Switzerland</u> *(2016) 63 E.H.R.R. 6*, the ECtHR held (at [133]):

> Even in cases in which the interference with the applicants' right to freedom of expression had taken the form of a criminal "penalty", the Court has recognised the impossibility of attaining absolute precision in the framing of laws, especially in fields in which the situation changes according to the prevailing views of society, and has accepted that the need to avoid rigidity and keep pace with changing circumstances means that many laws are couched in terms which are to some extent vague and whose interpretation and application are questions of practice.

### (b)   *The Communications Act 2003*

13. The regulatory regime governing TV licensing is 'prescribed by law' in and through the Communications Act 2003 ('the 2003 Act'). That is the statute which set up OFCOM and gave it its powers and duties. Central to those functions is the promulgation and enforcement of a 'standards code' about the content of programmes. The 2003 Act imposes a duty on OFCOM to set, and from time to time review and revise, such a code, as follows:

> **319.  OFCOM's standards code**
>
> (1) It shall be the duty of OFCOM to set, and from time to time to review and revise, such standards for the content of programmes to be included in television and radio services as appear to them best calculated to secure the standards objectives.
>
> …
>
> (3) The standards set by OFCOM under this section must be contained in one or more codes.

14. The 'standards objectives', which are thus mandated on OFCOM in its function of creating a standards code, are set out in s.319(2). They form a list of fourteen matters ranging over public policy issues such as the protection of children, the avoidance of subliminal influence, and the control of advertising and product placement. They also include the following provisions about news broadcasting:

> (2) The standards objectives are—
>
> …
>
> (c) that news included in television and radio services is presented with due impartiality and that the impartiality requirements of section 320 are complied with;
>
> (d) that news included in television and radio services is reported with due accuracy;