# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

**4CHAN COMMUNITY SUPPORT LLC**
*and* **LOLCOW, LLC**, d/b/a **KIWI FARMS**,

*Plaintiffs*,


*v.*

**THE UK OFFICE OF COMMUNICATIONS, a/k/a OFCOM**,

*Defendant*.

Case No. 1:25-cv-02880-RC

# PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION
# TO DISMISS THE COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(1)

Ronald D. Coleman
COLEMAN LAW FIRM, PC
DDC Bar ID: NY0460
50 Park Place, Suite 1105
Newark, NJ 07102
973-264-9611
rcoleman@colemanlaw-pc.com

Preston J. Byrne
BYRNE & STORM, P.C.
DDC Bar ID: 1721858
782-788 Boston Post Rd, Suite 204
Madison, CT 06443
203-900-4076
preston@byrnestorm.com

*Attorneys for Plaintiffs*

# CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

A.  Fed. R. Civ. P. 12(b)(1) ........................................................................................ 13

B.  Foreign Sovereign Immunity Under The FSIA ...................................................... 13

    1.  General Principles of Sovereign Immunity .......................................................... 13

    2.  The "Core Functions" Test ................................................................................. 14

    3.  The "Organ" Test for Agency or Instrumentality Status ..................................... 14

C.  COMMERCIAL ACTIVITY EXCEPTION TO FSIA .......................................... 15

    1.  Definition of "Commercial Activity" ................................................................ 15

    2.  Distinguishing Commercial from Regulatory Activities ...................................... 15

D.  SERVICE OF PROCESS REQUIREMENTS UNDER THE FSIA ....................... 16

    1.  Hierarchical Methods of Service for Foreign States ............................................ 16

    2.  Requirements for Agencies or Instrumentalities .................................................. 16

    3.  Strict Enforcement in the D.C. Circuit ............................................................... 17

E.  FORUM NON CONVENIENS AND INTERNATIONAL COMITY ..................... 17

    1.  Two-Step Analysis for Forum Non Conveniens ................................................. 17

    2.  Private and Public Interest Factors ..................................................................... 18

    3.  International Comity Principles ........................................................................... 18

F.  STANDING AND RIPENESS ............................................................................... 19

    1.  Article III Standing Requirements ..................................................................... 19

    2.  Standards for Pre-Enforcement Challenges ....................................................... 19

    3.  Ripeness Doctrine .............................................................................................. 19

II.  OFCOM'S CLAIM OF SOVEREIGN IMMUNITY FAILS BECAUSE THE OFCOM'S CONDUCT AND OPERATIONS INVALIDATE THAT DEFENSE UNDER THE COMMERCIAL ACTIVITY EXCEPTION. ................................................................. 20

III.  THE COURT HAS JURISDICTION TO HEAR THIS CASE AND SHOULD NOT DISMISS IT ON THE BASIS OF FORUM NON CONVENIENS OR COMITY ................... 28

IV.  PLAINTIFF KIWI FARMS HAS STANDING ................................................... 33

# TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Gardner*, 387 U.S. 136 (1967) ............................................................ 18

*Agudas Chasidei Chabad v. Russian Fed'n*, 528 F.3d 934 (2008) .......................... 16, 17

*Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137 (D.C. Cir. 2011) ...................................... 11

*Barot v. Embassy of Zambia*, 785 F.3d 26 (2015) ...................................................... 15

*Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175 (2013) ...................... 12

*CC/Devas (Mauritius) Ltd. v. Antrix Corp.*, __ U.S. __, 145 S. Ct. 1572, 1578, 221 L. Ed. 2d 867
(2025) .................................................................................................................... 11

*De Csepel v. Republic of Hung.*, 714 F.3d 591 (2013) ................................................ 16

*Filler v. Hanvit Bank*, 378 F.3d 213 (2d Cir. 2004) .................................................... 13

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ........................................................ 17

*Mady Marylouise Schubarth v. Fed. Republic of Germany*, No. 14-cv-2140 (CRC), 2020 U.S.
Dist. LEXIS 264117 (D.D.C. Mar. 12, 2020) ...................................................... 13

*Moody v. NetChoice, LLC*, 603 U.S. 707, 710 (2024) ................................................ 20

*Mutambara, supra,  v. Lufthansa German Airlines*, Civil Action No. 02-0827, 2003 U.S. Dist.
LEXIS 5755 (D.D.C. Mar. 24, 2003) .............................................................. 16, 17

*Netchoice v. Bonta*, No. 23-2969 (9th Cir. 2024) ...................................................... 20

*Peterson v. Islamic Republic of Iran*, 563 F. Supp. 2d 268 (D.D.C. 2008) ................. 13

*Republic of Arg. v. Weltover, Inc.*, 504 U.S. 607 (1992) ...................................... *passim*

*Rosenkrantz v. Inter-American Dev. Bank*, 35 F.4th 854 (2022) ................................. 14

*Rumble Inc. v. De Moraes*, No. 8:25-cv-00411 (M.D. Fla. Feb. 22, 2025) ................. 28

*Saudi Arabia v. Nelson*, 507 U.S. 349, 358 (1993) .................................................... 19

*Some, Inc. v. Hanover Ins. Co.*, Civil Action No. 21-493 (BAH), 2021 U.S. Dist. LEXIS 129796,
(D.D.C. July 13, 2021) .................................................................................... 18, 33

*Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) .......................................... 18

*Transaero, Inc. v. La Fuerza Aerea Boliviana,* 30 F.3d 148 (1994) ............................ 12

*X Corp v. Center for Countering Digital Hate, Inc.*, 724 F. Supp. 3d 948 (N.D. Cal, 2024) (No.
3:23-cv-03836) .................................................................................................. 21

**Statutes**

28 U.S.C. § 1602 ................................................................................................... 12, 25

28 U.S.C. § 1604 ....................................................................................................... 12

28 U.S.C. § 1605 ....................................................................................................... 19

28 U.S.C. § 1608 ................................................................................................... 14, 15

28 U.S.C. §§ 1330, 1332(a), 1391(f) and 1602-1611 ........................................... *passim*

47 U.S.C. § 230 ....................................................................................................... 4, 10

Cal. Civ. Code §§ 1798.99.31(d), 1798.99.33(b) ......................................................... 20

Cal. Civ. Code, Code of Civ. P. § 425.16 .................................................................... 21

UK Online Safety Act 2023 ................................................................................... *passim*

**Other Authorities**

Connor Stringer, *White House Warns Starmer: Stop Threatening US Tech Companies' Free Speech*, The Telegraph (July 30, 2025) ............................................................... 2

GB News (@GBNEWS), X.com, December 3, 2025 ............................................... 2

Ofcom, *Global Online Safety Regulators Network* (Mar. 14, 2024) ........................... 25

The Censorship-Industrial Complex: *Hearing Before the H. Comm. on the Judiciary*, 119th Cong. (Feb. 12, 2025) ............................................................................. 24

World Federation of Advertisers, *Statement on the Global Alliance for Responsible Media (GARM)* (Aug. 9, 2024) ............................................................................. 22

**Rules**

Fed. R. Civ. P. 12(b)(1) .......................................................................................... 11

**Constitutional Provisions**

Article III of the Constitution ................................................................................ 17

U.S.C. Const. Amend. 1 ......................................................................... 9, 10, 20, 26

U.S.C. Const. Amend. 4 ........................................................................................ 10

U.S.C. Const. Amend. 5 ........................................................................................ 10

**Treaties**

Hague Service Convention ..................................................................................... 27

US-UK Mutual Legal Assistance Treaty ............................................................ 7, 27

## PRELIMINARY STATEMENT[1]

There is an important difference between "closed" and "open" societies with respect to censorship – but it is not always the difference we expect.  In totalitarian states such as North Korea and Cuba, governments control what information and "content" are available to their citizens by erecting legal and technological walls around their own borders, both real and virtual. Such totalitarian regimes bear no effective political or economic cost for this; only their people suffer from these restrictions. In contrast, an increasing number of states that reckon themselves free and democratic also now seek to restrict expression within their borders, but, lacking the political mandate to implement technological control measures to restrict access to such information themselves, seek to effectuate a measure of censorship over American targets by beggar-thy-neighbor laws that offload the political and technical implementation costs of implementing their censorship programs onto American entities and persons over whom they purport to have legal authority.

This lawsuit seeks a legal declaration and determination that will, as a practical matter, confirm that this strategy will not and cannot work against Americans. The legal authority to conscript Americans to perform censorship does not exist – and cannot, because the First Amendment to the Constitution prohibits it.

Plaintiffs do not dispute that the lawsuit they have filed is extraordinary. It has an extraordinary historical and factual background, and forms one small part of a wider, high-stakes, and continuing diplomatic standoff between the United States, the world's sole superpower and greatest guarantor of free expression, and several of the world's former and would-be powers, most

---

[1] Unless stated otherwise, all facts set forth in the Preliminary Statement and Statement of Facts in this submission are based on the allegations of the Complaint.

of which are America's traditional allies. These include the United Kingdom of Great Britain and Northern Ireland ("UK") and the European Union ("EU") and its 27 member countries, as reported on extensively in the global press. This dispute has, for nearly half a year, been a matter of significant diplomatic friction between the United States and its allies. See, e.g., Connor Stringer, *White House Warns Starmer: Stop Threatening US Tech Companies' Free Speech*, The Telegraph (July 30, 2025).[2]

Even during the pendency of this case, the issues this case raises have received attention at the highest levels of American government as well as leadership in several U.S. States. United States Under Secretary of State for Public Diplomacy Sarah Rogers, giving an interview to the television network GB News during a diplomatic trip to London on December 3, 2025, said that the United States viewed Defendant Ofcom's conduct in this and other cases as the censorship of "Americans in America." Rogers added that Ofcom's conduct was regarded by the federal government as a "deal-breaker. It is a non-starter. It is a red line, and that is what Ofcom is trying to do with the Online Safety Act, and that's one reason that the American government is concerned." GB News (@GBNEWS), X.com, December 3, 2025.[3]

This showdown reached its present level of intensity after the United Kingdom ("UK"), the United States' most important international ally and, ironically, the political and cultural source of American free speech values, began implementing a flagship Internet censorship law it enacted in October of 2023. This is the Online Safety Act 2023 (the "OSA") which that country now seeks to enforce against persons all over the world, including against at least four companies in the

---

[2] Found at https://www.telegraph.co.uk/us/news/2025/07/30/white-house-warns-starmer-tech-online-safety-bill/.

[3] Found at https://x.com/GBNEWS/status/1996386992431513899.

United States, two of which are the Plaintiffs. The OSA purports to have extraterritorial effect, including in the United States and against U.S. citizens. Under the OSA, a corporation, Ofcom, has been granted vast powers by the UK Parliament to, among other things, project the UK's sovereign authority beyond its borders into places the UK's law enforcers have no right be, including in the United States.

The conduct Ofcom, being the UK's designated Internet speech enforcer, seeks to control, in this case, is the hosting and management of Plaintiffs' web servers in the United States, which is being done by Plaintiffs entirely lawfully under United States law and in a manner protected by the United States Constitution. This lawsuit, however, is not about that complex, world-historical cross-border sovereignty clash between the United States and its allies on the topic of Internet regulation, of which the plight of the Plaintiffs is but one small part. This lawsuit does not ask the Court to intervene in that diplomatic standoff, nor to reach any conclusion about the UK's sovereign lawmaking capacity, nor to decide which nation has or should have the power to write the rules of the road for the global Internet.

This lawsuit pivots, at this stage, on one fact: That Ofcom purported to serve, by e-mail, legally binding orders under Section 100 of the OSA ("Section 100 Orders") on the Plaintiffs in the United States. (Defendant's Motion to Dismiss (the "Motion") at 7)  It served these orders on Plaintiff 4chan on April 14, 2025 and June 16, 2025 and on Plaintiff Kiwi Farms on July 25, 2025. When purporting to serve these orders on the Plaintiffs, Ofcom did not utilize any established international legal or treaty process or letters rogatory. Ofcom concedes that no treaty process and/or letters rogatory were used, and that these orders were all sent by mere e-mail. (Motion at 7, 16). It is settled U.S. law that Americans are not validly served across our national borders by e-

mail, as explained in more detail below. Ofcom's Section 100 Orders are, therefore, not binding on the Plaintiffs in the United States.

Accordingly, the Plaintiffs, in the Complaint, asked the Court to decide two very simple questions. Were the Ofcom's Section 100 Orders, communicated to the Plaintiffs by e-mail, validly served on the Plaintiffs in the United States? And if those orders were validly served, were those orders constitutional?

If the Court concludes, as Plaintiffs argue below, that it has jurisdiction over this action, and answers the first of these questions in the negative, there is no need to answer the second question on constitutionality; if valid service has not been made on the Plaintiffs, as Plaintiffs allege, the constitutionality of that service would not yet be ripe for judicial review. Judgment on the first and second counts of the Complaint should be entered for the Plaintiffs, with the third and fourth counts of the Complaint dismissed as moot. Alternatively, if the Court comes to a different conclusion regarding the first question, or reserves judgment on the issue, it can and should proceed to rule on the constitutionality of Ofcom's purported service or its validity otherwise and deny the Motion.

## **STATEMENT OF FACTS**

This case arises from the unlawful extraterritorial enforcement efforts by the United Kingdom's Office of Communications ("Ofcom") against two United States-based internet companies: 4chan Community Support LLC ("4chan") and Lolcow, LLC, doing business as Kiwi Farms ("Kiwi Farms"). Plaintiffs operate websites that comply fully with United States law and enjoy constitutional protections under the First, Fourth, and Fifth Amendments, as well as immunity under Section 230 of the Communications Decency Act (47 U.S.C. § 230).

Ofcom has issued multiple written demands and threats of severe civil and criminal penalties to Plaintiffs, seeking to impose UK regulatory requirements on their US-based operations despite their lack of physical presence, infrastructure, or operations in the United Kingdom. These demands include compelled production of risk assessments, compelled user age verification requirements, compelled removal of constitutionally protected speech, and compelled disclosures – all under threat of substantial fines and potential imprisonment.

The factual record, which must be accepted as true at this stage of the proceedings, establishes that Ofcom has engaged in commercial activities directed at US companies, improperly attempted to serve legal process, and threatened enforcement actions that would violate Plaintiffs' constitutional rights. These factual allegations provide a sufficient basis for this Court to deny Defendant Ofcom's motion to dismiss.

**The Parties and Their Operations**

Plaintiffs 4chan Community Support LLC and Lolcow, LLC are limited liability companies formed under the laws of Delaware and West Virginia, respectively. 4chan operates a global imageboard website that is "one of the most well-known websites in the world," while Kiwi Farms operates a discussion forum focused on internet culture that is "one of the most well-known small websites in the world." Both companies operate entirely within the territorial boundaries of the United States, with no presence, infrastructure, or operations abroad.

4chan's registered office is in Dover, Delaware. Kiwi Farms' address is South Charleston, West Virginia. Both websites, while described as "controversial," operate in full compliance with applicable US laws, and their editorial decisions regarding hosted content are protected by the First Amendment to the United States Constitution. Plaintiffs permit anonymous and pseudonymous user participation, a practice also protected under the First Amendment.

Ofcom is a statutory corporation established by the UK Parliament under the Communications Act 2003 and charged with regulating broadcasting and online communications within the United Kingdom. Ofcom describes itself as "independent of government and the companies we regulate."  Indeed, contrary to typical government agencies, Ofcom is not funded directly by taxpayers or the UK government. Instead, Ofcom is funded primarily through fees paid by the companies it "regulates," making it operate in the manner of a private player within these companies' markets. Plaintiffs allege, therefore, that the UK's actions through Ofcom are commercial within the meaning of the Foreign Sovereign Immunities Act (28 U.S.C. Sec. 1330, 1332(a), 1391(f) and 1602-1611) ("FSIA").

Ofcom is responsible for administering the UK's Online Safety Act 2023 ("OSA"), which purports to regulate online content globally, including content hosted on servers in the United States. Ofcom has stated on its website that "over 100,000 online services are likely to be in scope of the Online Safety Act – from the largest social media platforms to the smallest community forum." On information and belief, most of these "online services" are based not in the United Kingdom, but in the United States.

**Ofcom's Commercial Structure and Activities**

Ofcom operates as a commercial enterprise with a statutory monopoly on content moderation policy services under the Online Safety Act 2023. The OSA grants Ofcom the authority to charge large web companies with qualifying worldwide revenue over £250,000,000 approximately 0.02% of their worldwide turnover as a fee to fund its operations (the "Ofcom Service Fee"). Ofcom announced that the legal regime for the Ofcom Service Fee entered into force on December 11, 2025, and provides advice on its website for companies to calculate the payments owed and guidance as to how Ofcom will "invoice" those companies for the fees due,

the payment of which it describes as "fees-related duties."[4] ("Fees Duties") Ofcom's commercial activities include providing content moderation policy-writing services for which it charges the Ofcom Service Fee. These services correspond to functions typically performed by technology companies' in-house in legal and policy departments. Unlike voluntary policy frameworks developed in-house, however, Ofcom's commercial policymaking purports to be compulsory – even when applied to persons over whom it does not, and cannot, have personal jurisdiction under United States law and international law.

**Ofcom's Enforcement Actions Against 4chan**

Beginning in April 2025, Ofcom initiated a series of enforcement actions against 4chan. On April 14, 2025, Ofcom sent a "legally binding information notice" to 4chan (the "4chan Information Notice"). This notice demanded that 4chan provide information about its compliance with the OSA and threatened that "failure to comply" may "constitute a criminal offence" resulting in a fine of £18 million or 10% of 4chan's worldwide turnover, arrest, and/or "imprisonment for a term of up to two years, or a fine (or both)." Ofcom sent this notice, by e-mail, to 4chan's corporate services company, which is not authorized to accept service by e-mail on behalf of 4chan.

On April 30, 2025, Ofcom sent a second letter to 4chan (the "4chan Failure to Respond to Information Notice Letter"). This letter reiterated the demand for compliance with the 4chan Information Notice, threatened a penalty of £18 million or 10% of 4chan's worldwide revenue, and advised 4chan that failing to comply with the 4chan Information Notice was a criminal offense. Ofcom continued its enforcement efforts with additional communications, both before and during the pendency of this case:

---

[4] Found at https://www.ofcom.org.uk/online-safety/online-safety-fees-and-penalties

1.      On June 9, 2025, Ofcom sent a letter advising 4chan that it intended to open an investigation into 4chan for suspected violations of "illegal content risk assessment duties," "safety duties about illegal content," "record-keeping and review duties," and "Section 102(8) duties about information notices."

2.      On June 16, 2025, Ofcom sent a "final legal notice" to 4chan, again threatening criminal penalties and substantial fines for non-compliance.

3.      On July 9, 2025, Ofcom sent a "Preliminary Contravention Email" stating its intention to issue a "Provisional Notice of Contravention" concerning 4chan's failure to provide information requested in the previous notices.

4.      On August 12, 2025, Ofcom sent a 33-page "Provisional Decision Notice" finding that 4chan violated Section 102(8) of the OSA and threatening to impose a fine of £20,000 plus daily fines of £100 for up to sixty days.

5.      On October 13, 2025, Ofcom sent a 38-page "Confirmation Decision," formally imposing that fine, by e-mail. In that Confirmation Decision, Ofcom stated, *inter alia*, that "We note 4chan's submission… that American businesses are protected from UK legislation by the First Amendment and that Ofcom has no power to enforce UK laws in the US. We do not accept this point." Ofcom also stated in the Confirmation Decision that "[t]he [OSA] expressly anticipates that it will have extra-territorial effect" and that Ofcom "considers that imposing a financial penalty in this case would ensure that both 4chan and the wider sector understand how seriously Ofcom takes compliance with these duties." Plaintiff 4chan's counsel published the Confirmation Decision on October 16, 2025. Ofcom published the Confirmation Decision on its own website on November 11, 2025.

6.      On December 4, 2025, three days after it filed its Motion with the Court, Ofcom informed Plaintiff 4chan, by e-mail (the "December 4, 2025 E-Mail"), that Ofcom was "[e]xpanding the scope" of its investigation into Plaintiff 4chan's perfectly lawful activities. Ofcom stated that it is "a UK-based regulator, but that does not mean the rules do not apply to sites based abroad. Part 3 of the [OSA] places legal duties on providers of user-to-user search services… you are required to introduce highly effective age assurance for users."

Several other messages were sent to e-mail addresses at the 4chan.org domain unrelated to legal process. The gravamen of this action is that none of these communications was validly served under the US-UK Mutual Legal Assistance Treaty or other proper international legal procedures.

**Ofcom's Enforcement Actions Against Kiwi Farms**

Ofcom's enforcement actions against Kiwi Farms began on March 26, 2025, when it sent an "Advisory Letter" by e-mail. This letter stated that Ofcom "is the regulator for online safety in the UK under the UK's Online Safety Act 2023 ('the Act'), which created a new regulatory framework with the purpose of making regulated services safer for UK users." The letter explicitly asserted that "it does not matter where you or your business are based, the duties will apply to you or your business if the service you provide has links to the UK."

The Advisory Letter informed Kiwi Farms that it was required to "carry out an illegal content risk assessment" and "keep a record of their risk assessments." It also stated that Ofcom would be sending a "legally binding information notice" requiring Kiwi Farms to submit records of its risk assessment by April 17, 2025. The letter threatened that failure to comply could result in "enforcement action, including financial penalties of £18 million, or up to 10% of a regulated service's worldwide revenue, whichever is greater." In response to this letter, Kiwi Farms initially blocked UK users from accessing its website. Through counsel, Kiwi Farms replied to the Advisory Letter on March 31, 2025, stating that "where Americans are concerned, the Online Safety Act purports to legislate the Constitution out of existence. Parliament does not have that authority. That issue was settled, decisively, 243 years ago in a war that the UK's armies lost and are not in any position to relitigate."

On July 16, 2025, the Kiwi Farms website was temporarily taken down for maintenance. When service was restored that same day, the UK IP block was not immediately reactivated due to ongoing site maintenance work. Despite this brief and unintentional availability in the UK, Ofcom sent a second demand to Kiwi Farms on July 25, 2025, again demanding compliance with the OSA.

After receiving this second demand, Kiwi Farms decided that it had an obligation to do its part to defend the First Amendment, and resist. For this reason, Kiwi Farms decided not to restore the IP block of the UK. This decision was made by Kiwi Farms with full knowledge that Ofcom had threatened American citizens and companies with criminal penalties for non-compliance, as this was a matter of public record at that time. Following the Advisory Letter, Ofcom made a public statement to Recorded Future news, published on March 28, 2025, stating "make no mistake, providers who fail to introduce measures to UK users from illegal content can expect to face enforcement action." This statement constituted a threat of criminal penalties directed toward Kiwi Farms and other US-based websites.

**The Nature and Impact of Ofcom's Demands**

Ofcom's demands would require Plaintiffs to take several actions that Plaintiffs allege directly conflict with their constitutional rights and business operations:

1. *Conduct and Document Risk Assessments:* Section 9 of the OSA purports to require US companies to conduct written "risk assessments" for their compliance with UK law, keep those assessments up to date, notify Ofcom of any changes in those risk assessments, carry out further assessments before altering their service or software, and assess the "level of risk of individuals who are users of the service encountering" various types of content, including speech that is protected by the First Amendment in the United States.

2. *Remove Protected Speech:* The OSA purports to impose legal duties on US companies to remove user speech hosted on US platforms, either proactively in the case of "priority illegal content" (Section 10(2)) or on a notice-and-takedown basis for ordinary "illegal content" (Section 10(3)(b)). This includes speech that is protected under the First Amendment.

3. *Verify User Ages:* Section 12(4) of the OSA purports to require Plaintiffs to verify the age of their users, which would prevent users from using their services anonymously or pseudonymously. This conflicts with Plaintiffs' right to permit anonymous use of their platforms and their users' rights to anonymous speech. While this specific age verification requirement is not the subject of this case, Ofcom has commenced enforcement of this requirement against Plaintiff 4chan on December 4, 2025, as communicated in the December 4, 2025 E-mail.

4.    *Provide Potentially Incriminating Information:* Section 100 of the OSA purports to grant Ofcom the power to issue demands ("Section 100 Orders") compelling recipients to provide information that Ofcom requires for exercising its functions. Under Section 113, failure to respond to a Section 100 Order is punishable by civil fines and criminal charges. If Ofcom determines a response is deemed deficient in certain specified ways, for example the information is false, encrypted, or if a person intends to prevent Ofcom from reviewing the information, these acts – which are not in and of themselves crimes in the United States and, in the case of encrypted material, may even be constitutionally protected – are punishable by a term of imprisonment for up to two years.

The Complaint is premised on Plaintiffs' assertion that these demands directly conflict with Plaintiffs' constitutional rights under the First Amendment (protection of free speech and editorial discretion), U.S.C. Const. Amend. 1, the Fourth Amendment (protection against unreasonable searches), U.S.C. Const. Amend. 4, and the Fifth Amendment (protection against self-incrimination and right to due process) U.S.C. Const. Amend. 5. Additionally, Plaintiffs maintain that Ofcom's demands conflict with Section 230 of the Communications Decency Act, 47 U.S.C. § 230, which immunizes providers of interactive computer services from liability for content created by their users because Plaintiffs are providers of "interactive computer services" as defined in Section 230, but Ofcom seeks to treat them as publishers or speakers of third-party content.

**Concrete Harms to Plaintiffs**

Plaintiffs have suffered concrete harms because of Ofcom's actions. These include the threat of ruinous financial penalties of up to £18 million or 10% of worldwide revenue; the threat of criminal prosecution and imprisonment for up to two years; the burden of responding to improper demands and threats; the potential need to implement costly compliance measures that would fundamentally alter their business operations; the chilling effect on constitutionally protected speech; and, for Kiwi Farms specifically, the initial implementation of IP blocking for UK users, which required technical resources and potentially reduced user engagement.

Because of these harms, the Complaint alleges, Plaintiffs face an untenable choice: either comply with Ofcom's demands and violate their users' constitutional rights or refuse to comply and face potentially devastating financial penalties and business disruption. This dilemma constitutes an ongoing injury that cannot be remedied without judicial intervention.

**Ofcom's Targeting of US Companies**

Plaintiffs alleged that Ofcom targeted Plaintiffs not as part of neutral enforcement activity, but for overtly political reasons aimed at undermining the First Amendment in the United States, intimidating Americans in the free exercise of their constitutional rights, and crippling the American Internet sector.

All four of Ofcom's first enforcement actions against social media companies were directed at American companies, including the Plaintiffs. These actions appear to deliberately target some of the most well-known, but financially vulnerable platforms in the United States, making public examples of them to signal consequences to larger American companies that might otherwise resist the UK's regulatory overreach through the lawful exercise of their constitutional rights. Indeed, in its Confirmation Decision sent to Plaintiff 4chan and which Ofcom later published on its own website, referenced above, Ofcom stated that "imposing a financial penalty in this case would ensure that both 4chan and the wider sector understand how seriously Ofcom takes compliance with these duties" – including, presumably not just the censorship duties, but aforementioned Fees Duties as well.

## ARGUMENT

Defendant's Motion makes three primary arguments, concerning (1) sovereign immunity, (2) comity and *forum non conveniens*, and (3) the standing of Plaintiff Kiwi Farms. These arguments are addressed below in turn.

I.      **LEGAL STANDARDS**

A.      **Fed. R. Civ. P. 12(b)(1)**

Ofcom's motion arises under Fed. R. Civ. P. 12(b)(1) on the ground that the Court lacks jurisdiction over Ofcom under the FSIA.  When deciding a Rule 12(b)(1) motion, the Court must "assume the truth of all material factual allegations in the complaint and construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged, and upon such facts determine jurisdictional questions." *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011). A court may, however, "undertake an independent investigation" that examines "facts developed in the record beyond the complaint" to "assure itself of its own subject matter jurisdiction." *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1107 (D.C. Cir. 2005). The FSIA is "the sole basis for obtaining jurisdiction over a foreign state in our courts." *CC/Devas (Mauritius) Ltd. v. Antrix Corp*., __ U.S. __, 145 S. Ct. 1572, 1578, 221 L. Ed. 2d 867 (2025). It grants federal district courts subject-matter jurisdiction over "any nonjury civil action against a foreign state . . . as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity." 28 U.S.C. § 1330(a).

B.      **Foreign Sovereign Immunity Under The FSIA**

1.      **General Principles of Sovereign Immunity**

The FSIA provides the exclusive basis for obtaining jurisdiction over a foreign state in United States courts. Under the FSIA, "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605-1607." 28 U.S.C. § 1604. Congress enacted the FSIA to ensure that "claims of foreign states to immunity from the jurisdiction of such courts would serve the interests of justice and would protect the rights of both foreign states and litigants in United States courts." 28 U.S.C. § 1602.

The term "foreign state" includes "a political subdivision of a foreign state or an agency or instrumentality of a foreign state." 28 U.S.C. § 1603. Once a defendant establishes a prima facie case of immunity, "the plaintiff bears the burden of production to show an exception applies," after which "the defendant bears the ultimate burden of persuasion to show the exception does not apply." *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175 (2013).

### 2.    The "Core Functions" Test

To determine whether an entity qualifies as a "foreign state" itself or merely an "agency or instrumentality" under the FSIA, the D.C. Circuit applies the "core functions" test established in *Transaero, Inc. v. La Fuerza Aerea Boliviana,* 30 F.3d 148 (1994). Under this test, "if the core functions of the entity are governmental, it is considered the foreign state itself; if commercial, the entity is an agency or instrumentality of the foreign state." 333 F.3d 228 (2003). Courts in the D.C. Circuit have consistently applied this test to determine whether entities are part of the foreign state itself. For example, courts have held that "a state's ministry of foreign affairs, executive agencies, and embassies must be treated as the state itself under the FSIA." *Mady Marylouise Schubarth v. Fed. Republic of Germany*, No. 14-cv-2140 (CRC), 2020 U.S. Dist. LEXIS 264117 (D.D.C. Mar. 12, 2020). In contrast, "the commercial operations of a state air force, state-owned banks, and state art museums have been determined to be largely commercial." *Id*.

### 3.    The "Organ" Test for Agency or Instrumentality Status

For entities that are not part of the state itself, courts must determine whether they qualify as an "agency or instrumentality" under the FSIA. An entity is an "agency or instrumentality" if it: (1) is a separate legal person; (2) is an organ of a foreign state or political subdivision, or a majority of whose shares or ownership interest is owned by a foreign state or political subdivision; and (3) is neither a citizen of the United States nor created under the laws of any third country.

14

*Peterson v. Islamic Republic of Iran*, 563 F. Supp. 2d 268 (D.D.C. 2008). To determine whether an entity is an "organ" of a foreign state, courts consider several factors: "(1) whether the foreign state created the entity for a national purpose; (2) whether the foreign state actively supervises the entity; (3) whether the foreign state requires the hiring of public employees and pays their salaries; (4) whether the entity holds exclusive rights to some right in the foreign country; and (5) how the entity is treated under foreign state law." *Filler v. Hanvit Bank*, 378 F.3d 213 (2d Cir. 2004).

### C.    COMMERCIAL ACTIVITY EXCEPTION TO FSIA

#### 1.    Definition of "Commercial Activity"

The FSIA's commercial activity exception provides that a foreign state is not immune from jurisdiction when "the action is based upon a commercial activity carried on in the United States by the foreign state." 28 U.S.C. § 1605. The Supreme Court has established that a foreign sovereign's actions are "commercial within the meaning of the FSIA" when the "foreign government acts, not as regulator of a market, but in the manner of a private player within it[.]" *Republic of Arg. v. Weltover, Inc.*, 504 U.S. 607 (1992). The Court emphasized that "the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in 'trade and traffic or commerce.'" *Id.*

#### 2.    Distinguishing Commercial from Regulatory Activities

Courts distinguish between commercial and regulatory activities by examining whether the actions in question are those that could be performed by private entities. An entity "engages in commercial activity [under the FSIA] where it exercises 'only those powers that can also be exercised by private citizens, as distinct from those powers peculiar to sovereigns.'" *Rosenkrantz v. Inter-American Dev. Bank*, 35 F.4th 854 (2022). If the alleged conduct "'is not typically performed by participants in the market,' it is not commercial activity under the FSIA." *Id.* The Supreme Court provided clear examples of this distinction: "a foreign government's issuance of

regulations limiting foreign currency exchange is a sovereign activity, because such authoritative control of commerce cannot be exercised by a private party; whereas a contract to buy army boots or even bullets is a 'commercial' activity, because private companies can similarly use sales contracts to acquire goods[.]" *Weltover*, *supra*, 504 U.S. 607.

### D.    SERVICE OF PROCESS REQUIREMENTS UNDER THE FSIA

#### 1.    Hierarchical Methods of Service for Foreign States

The FSIA establishes specific requirements for serving process on foreign states. Section 1608(a) provides four methods of service in descending order of preference:

a)    "By delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision."

b)    "By delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents."

c)    "By sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned."

d)    If service cannot be made within 30 days under the third method, "by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state."

#### 2.    Requirements for Agencies or Instrumentalities

The FSIA provides different service requirements for agencies or instrumentalities of foreign states under Section 1608(b):

a)    "By delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the agency or instrumentality."

b)    "By delivery of a copy of the summons and complaint either to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process in the United States; or in accordance with an applicable international convention on service of judicial documents."

c)    "If service cannot be made under paragraphs (1) or (2), and if reasonably calculated to give actual notice, by delivery of a copy of the summons and complaint, together with a translation of each into the official language of the foreign state."

### 3.    Strict Enforcement in the D.C. Circuit

The D.C. Circuit strictly enforces these service requirements. When serving a foreign sovereign, "strict adherence to the terms of 1608(a) is required." *Barot v. Embassy of Zambia*, 785 F.3d 26 (2015). In *Transaero*, the court held that neither substantial compliance nor actual notice sufficed under section 1608(a)(3) because Congress had mandated "service of the Ministry of Foreign Affairs, the department most likely to understand American procedure." *Barot v. Embassy of Zambia*, 785 F.3d 26 (2015). Proper service is essential to establishing personal jurisdiction over a foreign state. The FSIA provides that "personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title." 28 U.S.C. § 1330.

### E.    FORUM NON-CONVENIENS AND INTERNATIONAL COMITY

### 1.    Two-Step Analysis for Forum Non-Conveniens

The doctrine of forum non conveniens allows a court to dismiss a case when an alternative forum would be more appropriate for adjudication. The analysis involves two steps: "(1) whether an adequate alternative forum for the dispute is available and, if so, (2) whether a balancing of private and public interest factors strongly favors dismissal." *De Csepel v. Republic of Hung.*, 714 F.3d 591 (2013). Courts apply this test with deference to the plaintiff's choice of forum. As the D.C. Circuit has noted, "there is a substantial presumption in favor of a plaintiff's choice of forum."

*Agudas Chasidei Chabad v. Russian Fed'n*, 528 F.3d 934 (2008). The standard of review for *forum non conveniens* determinations is "clear abuse of discretion." *De Csepel v. Republic of Hung.*, 714 F.3d 591 (2013).

### 2.    Private and Public Interest Factors

When conducting the *forum non conveniens* analysis, courts weigh various private and public interest factors. Private interest factors include: "(1) relative ease of access to sources of proof; (2) availability of compulsory process for attendance of unwilling witnesses; (3) costs of obtaining attendance of willing witnesses; (4) possibility of viewing the premises; (5) other practical problems that impact the efficiency and cost of a trial; and (6) enforceability of a judgment if one is obtained." *Mutambara*, *supra*, *v. Lufthansa German Airlines*, Civil Action No. 02-0827, 2003 U.S. Dist. LEXIS 5755 (D.D.C. Mar. 24, 2003).  Public interest factors include: "(1) administrative difficulties flowing from court congestion; (2) local interest in having localized controversies decided at home; (3) avoidance of unnecessary choice of law problems; and (4) unfairness of burdening citizens in an unrelated forum with jury duty." *Id.*

### 3.    International Comity Principles

International comity principles may warrant dismissal in cases involving foreign sovereigns. One manifestation of these principles is the act of state doctrine, under which "a judicial branch will not examine the validity of a taking of property within its own territory by a foreign sovereign government, extant and recognized by the United States at the time of suit, in the absence of a treaty or other unambiguous agreement regarding controlling legal principles, even if the complaint alleges that the taking violates customary international law." *Agudas Chasidei Chabad*, *supra*, 528 F.3d 934. The doctrine "rests on a view that such judgments might hinder the conduct of foreign relations by the branches of government empowered to make and

execute foreign policy." *Id*. The burden of proving an act of state rests on the party asserting the defense. *Id*.

### F.    STANDING AND RIPENESS

#### 1.    Article III Standing Requirements

Article III of the Constitution limits federal court jurisdiction to actual "cases" and "controversies." To establish standing, a plaintiff must demonstrate: (1) an injury in fact that is concrete, particularized, and actual or imminent; (2) a causal connection between the injury and the conduct complained of; and (3) a likelihood that the injury will be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992).

#### 2.    Standards for Pre-Enforcement Challenges

Pre-enforcement challenges involve situations where a party seeks judicial review before a law or regulation is enforced against them. To maintain such challenges, plaintiffs must demonstrate "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014).

#### 3.    Ripeness Doctrine

The ripeness doctrine prevents courts from prematurely adjudicating disputes. A claim is ripe for adjudication when the issues are fit for judicial decision and withholding court consideration would cause hardship to the parties. *Abbott Labs. v. Gardner*, 387 U.S. 136 (1967). A claim is not ripe if it rests upon contingent future events that may not occur as anticipated or indeed may not occur at all. Ripeness will not bar a claim, however, if contingent harm is one of multiple forms of harms alleged and the pleading adequately alleges that it has already been harmed. *Some, Inc. v. Hanover Ins. Co*., Civil Action No. 21-493 (BAH), 2021 U.S. Dist. LEXIS 129796, at *11 (D.D.C. July 13, 2021).

## II.    OFCOM'S CLAIM OF SOVEREIGN IMMUNITY FAILS BECAUSE THE OFCOM'S CONDUCT AND OPERATIONS INVALIDATE THAT DEFENSE UNDER THE COMMERCIAL ACTIVITY EXCEPTION.

Ofcom's premise that Ofcom is a "foreign state" or an "agency or instrumentality of a foreign state" within the meaning of the FSIA. Plaintiff disagrees with this premise, for the reasons given in the Complaint. Ofcom bears the burden of establishing that threshold status. Nothing in this Opposition should be read as a concession that Ofcom is a "foreign state" under the FSIA or that its functions are exclusively sovereign. Plaintiffs simply seek to demonstrate that even if the Court were to assume that status arguendo, the commercial activity exception under the FSIA would still strip Ofcom of sovereign immunity in this case.

Ofcom's Motion states that "Ofcom's activities are plainly sovereign rather than commercial" and that Plaintiffs "have no response" to that assertion. (Motion at 21, 22.)

Plaintiffs do, in fact, have a response: Ofcom is not immune from suit in the United States because of the FSIA's "commercial activity" exception. 28 U.S.C. § 1605(a)(2). Federal courts have subject matter jurisdiction over suits arising from "commercial activity" that is either (1) "based upon a commercial activity carried on in the United States by the foreign state;" (2) "performed in the United States in connection with a commercial activity of the foreign state elsewhere;" or (3) carried on "outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that... causes a direct effect in the United States."

"Commercial activity" is defined by the FSIA as "either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." *Id.* § 1603(d). For the Court to assert jurisdiction

based on the commercial activity exception, being "based on" commercial activity requires "something more than a mere connection with, or relation to, commercial activity." *Saudi Arabia v. Nelson,* 507 U.S. 349, 358 (1993).

In *Republic of Argentina v. Weltover, supra*, the Court held, as Ofcom's Motion points out, that a foreign sovereign's actions were "commercial" within the meaning of the FSIA when "a foreign government acts, not as regulator of a market, **but in the manner of a private player within it**[.]" (Emphasis added.) *Id.* at 614; Motion at 20. That is not all that *Weltover* says on this topic. The Court adds, "the restrictive theory of foreign sovereign immunity would not bar a suit based upon a foreign state's participation in the marketplace in the manner of a private citizen or corporation. 425 U. S., at 698-705. A foreign state engaging in 'commercial' activities 'do[es] not exercise powers peculiar to sovereigns'; rather, it 'exercise[s] only those powers that can also be exercised by private citizens.' *Id.,* at 704." *Id.* 614, and that the "authoritative control of commerce" of the type it seeks to exercise "**cannot be exercised by a private party**[.]" (Emphasis added.) *Id.* at 614-15.

What Ofcom purports to do in the United States, namely, the regulation of constitutionally protected speech through the imposition of the Fees Duties and enforcement of "online harms" codes and content moderation mandates, is not something any sovereign entity or agency has the power to lawfully perform in the United States. U.S. Const. Amend. I.  So too in *Netchoice v. Bonta*, No. 23-2969 (9th Cir. 2024), the court struck down the State of California's Age-Appropriate Design Code Act (Cal. Civ. Code §§ 1798.99.31(d), 1798.99.33(b)) ("CAADCA") – a law similar in function to the OSA – holding that the plaintiffs in that case were "likely to succeed in showing that the CAADCA's requirement that covered businesses opine on and mitigate the risk that children may be exposed to harmful or potentially harmful materials online, Cal. Civ.

Code §§ 1798.99.31(a)(1)-(2), facially violates the First Amendment." (*Id*. at 7). Ofcom's motives in enforcing the OSA against Plaintiffs, namely, preventing a material risk of harm to individuals in the United Kingdom presented by user generated content, is similarly unpersuasive in establishing that Ofcom's actions are regulatory in nature. In the United States, "the government cannot get its way just by asserting an interest in better balancing the marketplace of ideas. In case after case, the Court has barred the government from forcing a private speaker to present views it wished to spurn in order to rejigger the expressive realm." *Moody v. NetChoice, LLC*, 603 U.S. 707, 710 (2024).

Plaintiffs do not raise these First Amendment cases to demonstrate that the assertion of a First Amendment right necessarily overrides the FSIA, though there may be an argument for that proposition under the right facts. These cases are quoted here, however, for the purpose of demonstrating that **the First Amendment defines the structure of the market for censorship in the United States – a market in which Ofcom now operates**. Thus, Ofcom's attempted enforcement of "online harms" or "online safety" standards in the United States of the type, and to the extent, Ofcom seeks to enforce is exclusively the domain of non-sovereign actors under our Constitution and, therefore, in this country, such activity can be taken, ipso facto, exclusively by private parties as part of commercial courses of dealing.

American market structure follows American law. The First Amendment permits and indeed expressly protects the rights of private citizens and corporations to advocate for any degree of censorship in the United States that they please. See, e.g., *X Corp v. Center for Countering Digital Hate, Inc.*, 724 F. Supp. 3d 948 (N.D. Cal, 2024) (No. 3:23-cv-03836)*,* in which a lawsuit against a leading global censorship advocacy organization (and, it bears mentioning, leading

advocate of the enactment of the Online Safety Act) by social media company X Corp. was dismissed under California's anti-SLAPP statute (Cal. Code, Code of Civ. P. § 425.16).

Ofcom, in seeking to influence Plaintiffs to comply with and adopt its content moderation codes, is engaging in activity which can only be exercised by private parties in the United States. *Weltover* draws a distinction between "a foreign government's issuance of regulations limiting foreign currency exchange" as a "sovereign activity, because such authoritative control of commerce cannot be exercised by a private party; whereas a contract to buy army boots or even bullets is a 'commercial' activity, because private companies can similarly use sales contracts to acquire goods." 504 U.S. 607 at 614-15.  If the United Kingdom had empowered Ofcom, by statute, to acquire goods for some regulatory end, for example market stability, the subsequent acquisition of goods in the United States would not change the commercial character of Ofcom's actions under the FSIA simply because the acquisition was cloaked in the authority of regulation.

Extending the analogy, the United Kingdom has empowered Ofcom, by statute, to engage in sweeping censorship in the United States and to impose the Fees Duties on Americans to compensate Ofcom for its censorship services. This is an activity which, under our constitutional structure, is carried out only by private actors. Cloaking that censorship campaign, or the Fees Duties, targeting U.S. citizens and companies in regulatory language does not change the nature of that activity for FSIA purposes, any more than calling a procurement contract a "market stability measure" would transform *Weltover*'s boot- or bullet-buying from an American counterparty into a sovereign act to which the commercial exception does not apply.

Although Ofcom's attempt to force Plaintiff 4chan to adopt its rules is the first time Ofcom has ever attempted to enforce its content moderation standards, it is far from the first time private actors in the United States have attempted to do the same.

23

One, well-known, private actor in this space was the Global Alliance for Responsible Media, or GARM. GARM, which was a commercial enterprise, described itself as "a voluntary cross-industry initiative created in 2019 to address digital safety." Among other things, GARM provided a range of policy frameworks and guidelines, among them "the Brand Safety Floor and the Adjacency Standards Framework, which have supported brand owners in their independent development of their own bespoke, brand-specific safety frameworks to ensure that their advertising dollars do not inadvertently support illegal or harmful content that damages their brands." World Federation of Advertisers, *Statement on the Global Alliance for Responsible Media (GARM)* (Aug. 9, 2024).[5] Although GARM disbanded in 2024, according to the House Judiciary Committee, during its active periods GARM worked with global regulators to pressure companies like Twitter, now X Corp., to wield "significant collective power" to coercively influence Twitter's moderation decisions, including "silencing President Trump," and to procure boycotts of the platform if the platform refused to obey. Staff of H. Comm. on the Judiciary, 119th Cong., *Exporting Censorship: How GARM's Advertising Cartel Helped Corporations Collude with Foreign Governments to Silence American Speech* (2025).[6]

GARM's primary commercial objective was the commercial suppression of constitutionally protected speech and expression. Per the House Judiciary Committee, "According to GARM's own documents, Gallup polling showed that 66 percent of American consumers valued free expression over protection from harmful content during the same period GARM was engaging in its coordinated behavior. Despite that, GARM chose to continue its efforts to 'eliminate all categories of harmful content in the fastest possible timing.'" *Id.*

---

[5] Found at https://wfanet.org/leadership/garm.

[6] Found at https://judiciary.house.gov/sites/evo-subsites/republicans-judiciary.house.gov/files/2025-06/Exporting%20Censorship%20Final.pdf

House Judiciary Committee staff point out that "The Documents produced to the Committee, and detailed in this report, showcase the extent to which GARM went to impose its censorial standards on American social media platforms. GARM worked closely with foreign regulators in reaction to Twitter's reorientation toward free speech. GARM shared nonpublic information with its members, knowing the information could lead to a group boycott of Twitter. GARM not only colluded to attack businesses that disagree with GARM's worldview, but the very principles underlying the freedom of expression, the marketplace of ideas, and fundamental American liberties—all to the detriment of the people they claim to serve." *Id*.

The House Judiciary Committee also alleges that such censorship activity is collusive in nature and hinted at its anticompetitive – ergo, inherently commercial – impact in the United States, writing that "GARM consistently attempted to hide the collusive, censorship-focused goals of its members and Steer Team behind the worthy-sounding goals of reducing "harmful" content online. This deception allowed GARM to claim that its actions benefited consumers when in reality, GARM's actions benefited the cartel at the expense of consumers." *Id*.

This is in line with Ofcom's stated aims of requiring American citizens to "assess and mitigate the risk that UK users will encounter illegal content," Motion at 1, much of which is perfectly lawful in the United States. Ofcom, if it gets its way and succeeds in its aims of controlling the U.S. digital services market, will limit consumer choice in the United States. This is true even if Ofcom only prevents U.S. Internet consumers from freely communicating with individuals in the UK.

GARM was one of many private pro-censorship organizations in the United States of the type which, even today, focus on similar or identical objectives to Ofcom, often under the guise of euphemisms for censorship such as "brand safety" and "tackling disinformation." Organizations

operating in this area currently include aforementioned Center for Countering Digital Hate ("CCDH"), the Change the Terms Coalition, and NewsGuard. Some of these private organizations even dress up their private offerings in authoritative-sounding, quasi-regulatory naming conventions, such as the "Advertiser Protection Bureau." This system of private, and sometimes public-private, censorship has become known in free speech activist circles as the "censorship-industrial complex." *The Censorship-Industrial Complex: Hearing Before the H. Comm. on the Judiciary, 119th Cong.* (Feb. 12, 2025).[7]

Ofcom openly admits to collaborating with American private parties who are active in the censorship-industrial complex as it carries out its work. Examples include the University of Southern California Neely Center, the Integrity Institute, and New York University's Stern School of Business. Ofcom, *Global Online Safety Regulators Network* (Mar. 14, 2024)[8] These are not sovereign bodies; they are private academic and advocacy institutions. Yet, Ofcom's own Global Online Safety Regulators Network materials show that these entities, all of which are American, participate in Ofcom's work as "observers" and partners in a project "dedicated to supporting collaboration between online safety regulators," including on issues that directly implicate U.S. platforms and users, including, presumably, the Plaintiffs. *Id*.

Dismissing this case at the pleading stage would deny Plaintiffs the opportunity to take jurisdictional discovery to determine the full extent of Ofcom's U.S.-focused activities and relationships, for example to determine how each of the Plaintiffs – Plaintiff Kiwi Farms, in particular, is a tiny, obscure website, but one known and vilified by the U.S. censorship-industrial complex – were targeted for enforcement action, whether this targeting was conducted in

---

[7] See, https://www.congress.gov/event/119th-congress/house-event/117881.

[8] Found at https://www.ofcom.org.uk/about-ofcom/international-work/gosrn (last updated Nov. 20, 2025).

coordination with U.S.-based commercial actors, and to further substantiate that Ofcom's conduct in the United States is commercial in nature. That Ofcom chooses to dress up in regulatory language and process what is, in the United States, a form of activity that only private actors may lawfully perform does not change the essential fact that, in the U.S. market, Ofcom is operating as a peer and collaborator with private entities that seek to reshape the American Internet, in activities that, by law, only private parties are permitted to undertake in the United States.

The purpose of the FSIA is to immunize foreign states where such immunity "would serve the interests of justice and would protect the rights of both foreign states and litigants in United States courts." 28 U.S.C. § 1602. Ofcom's assertion, in its Confirmation Decision, that it "[does] not accept" that "American businesses are protected from enforcement of UK legislation by the First Amendment and that Ofcom has no power to enforce UK laws in the US" is untenable.

In claiming that the FSIA, a law promulgated under the sovereign authority of the U.S. Constitution, gives Ofcom the right to inject itself directly into the heart of the United States' vibrant digital economy and run roughshod over the First Amendment rights of millions of American citizens, chiefly Plaintiffs and their users, by threatening Plaintiffs with fines and arrest, all the while remaining utterly immune from the jurisdiction of this Court, Ofcom asks the Court to stretch the FSIA to the point of untenability, too.

In the United States, Ofcom has chosen to engage in the same kind of "online safety" and content-governance activities that, by virtue of our constitutional structure, can only be "exercised by private citizens" and cannot be exercised by sovereigns. Ofcom even dares to charge American citizens fees for these services: the aforementioned Fees Duties. Applying *Weltover* to this highly unusual fact pattern results in the unavoidable conclusion that Ofcom's activity falls squarely within the commercial exception to the FSIA. Despite the extraordinary nature of this case, treating

Ofcom as a commercial actor for FSIA purposes would not be extraordinary; it would simply place Ofcom on the same footing as every other participant in the long-running, and thoroughly commercial, censorship-industrial complex in the American marketplace of ideas, a market in which Ofcom, since the beginning of 2025, has become an active participant, with Plaintiff 4chan serving as its first, albeit stubborn and uncooperative, target in the U.S. market.

The extraordinary facts of this case, and the extremely narrow relief Plaintiffs seek, mean that the Court will be amply justified in finding that asserting jurisdiction over this case, by looking past Ofcom's self-serving "regulatory" labels and focusing on the substance of Ofcom's conduct, as indeed the FSIA requires, will best serve the interests of justice.

The Court should therefore hold that the commercial activity exception applies to Ofcom's conduct in this lawsuit.

### III.    THE COURT HAS JURISDICTION TO HEAR THIS CASE AND SHOULD NOT DISMISS IT ON THE BASIS OF FORUM NON CONVENIENS OR COMITY

Ofcom argues that this action should be dismissed in favor of proceedings in the United Kingdom based on forum non conveniens or international comity. But, as has been already stated, this case is not about comity or forum non conveniens at all. It is about the legal effect of Section 100 Orders in the United States.  In its Motion, Ofcom states that "Plaintiffs accuse Ofcom of infringing their constitutional and statutory rights by seeking to regulate the internet services they offer – for example, by demanding information and imposing penalties for failure to comply – and by serving the legal process used to effect that regulation." (Motion at 21)

The question of whether that legal process was validly served is not a point that Plaintiffs concede. Indeed, the question of service and the validity thereof is the central question of this case. This Court has been asked to decide whether Ofcom properly served the Plaintiffs with process,

in a manner cognizable to U.S. law, whether that be under the US-UK Mutual Legal Assistance Treaty, the Hague Service Convention, or letters rogatory. Plaintiffs claim that, in accordance with U.S. law, they have not been served at all.

Nothing in Ofcom's Motion, Declaration, or associated Exhibits contradicts Plaintiffs' arguments on this point. In fact, every factual assertion in the Motion supports it. As the Motion makes clear, Ofcom, on March 27, 2025, April 14, 2025, August 12, 2025, and October 13, 2025, sent e-mails to 4chan. (Motion at 7, 16). The only communications Plaintiff 4chan has ever received from Ofcom were sent by e-mail. Similarly, Ofcom's communications to Kiwi Farms on March 26, 2025, April 29, 2025, and July 25, 2025 were, likewise, sent by e-mail. The only communications Plaintiff Kiwi Farms has ever received from Ofcom were sent by e-mail.

Ofcom's refusal to comply with, or even acknowledge the applicability of, these international service conventions is an extremely serious matter. U.S. law on the subject, from a similar case to this one, *Rumble Inc.* and *Trump Media and Technology Group Corp. v. de Moraes,* which concerns the one-off, improper service of Brazilian court orders from a Brazilian Supreme Court justice seeking to censor American websites, is crystal clear: as put by counsel for the plaintiffs in that case, "[t]hese frameworks exist to balance the legitimate interests of sovereign states while safeguarding against the imposition of foreign legal standards that conflict with domestic laws. Justice Moraes's actions disrupt this balance, unilaterally and unlawfully, extending Brazilian judicial authority into the United States without the consent or oversight of U.S. authorities… Such conduct not only disregards the sovereignty of the United States but also sets a dangerous precedent, undermining trust in the legal processes designed to facilitate lawful and respectful international cooperation." Plaintiffs' Ex Parte Motion for Temporary Restraining

Order and Order to Show Cause as to Why a Preliminary Injunction Should Not Issue at 25, *Rumble Inc. v. De Moraes*, No. 8:25-cv-00411 (M.D. Fla. Feb. 22, 2025) (ECF No. 12).

Ofcom has clearly and knowingly circumvented the MLAT, the Hague Service Convention, and traditional letters rogatory by purporting to serve Plaintiffs by e-mail.  It is axiomatic that if Plaintiffs have not been served, Plaintiffs "are not obligated to comply with the directives and pronouncements, and no one is authorized or obligated to assist in their enforcement against Plaintiffs or their interests here in the United States." (Order at 2, *Rumble Inc. v. De Moraes*, No. 8:25-cv-00411 (M.D. Fla. Feb. 25, 2025) (ECF No. 26))

On October 13, 2025, nearly a month and a half after 4chan filed this Complaint, the Ofcom fined Plaintiff 4chan £20,000 (twenty thousand pounds Sterling) plus £100 (one hundred pounds Sterling) in daily penalties thereafter for a period of up to 60 days. Ofcom asks the Court to dismiss this action out of respect that foreign administrative process, stating in its Motion that "UK businesses cannot sue the Federal Communications Commission in the London High Court over regulatory disagreements. For the same reason, plaintiffs cannot sue Ofcom in this court either." (Motion at 2)

This case is not a "regulatory disagreement." Although Plaintiffs feel the OSA is a civil liberties abomination which tramples on the rights of Americans and Britons alike, they are not contesting the UK's laws, the UK's process, the UK's fine, or the right of the UK to legislate for itself, in future, any totalitarian nightmare Parliament wishes, in this Court. Save to reserve their U.S. constitutional rights, Plaintiffs have, lawfully exercising those constitutional rights, largely chosen not to engage in the UK's domestic process at all.

Ofcom, in its Motion, states that "Plaintiffs allege in sweeping terms that 'Ofcom's ambitions are to regulate Internet communications for the entire world, regardless of where these

websites are based or whether they have any connection to the UK.' Compl. ¶26. The Complaint offers no support for that extravagant claim and ignores statutory text that contradicts it." (Motion at 9)

The support for this claim comes from the UK Online Safety Act 2023 itself, which is expressed to apply to "a service provided from outside the United Kingdom" . OSA, Section 204(1).  Ofcom's own continuing conduct refutes any argument that this case should be a purely British affair.

In the Confirmation Decision, communicated to Plaintiff 4chan on October 13, 2025, Ofcom stated its belief that "[t]he [OSA] expressly anticipates that it will have extra-territorial effect" and that Ofcom "considers that imposing a financial penalty in this case would ensure that both 4chan and the wider sector" – *i.e.*, other Americans – "understand how seriously Ofcom takes compliance with these duties." In the December 4, 2025 E-Mail, three days after it filed its Motion with the Court, Ofcom informed Plaintiff 4chan that Ofcom was "[e]xpanding the scope" of its investigation into Plaintiff 4chan's perfectly lawful activities. Ofcom stated that it is "a UK-based regulator, but **that does not mean the rules do not apply to sites based abroad**. Part 3 of the [OSA] places legal duties on providers of user-to-user search services... you are required to introduce highly effective age assurance for users." (Emphasis added.) It is not the UK legal basis of Ofcom's power or the various paeans to the impartiality and fairness of the UK's legal system in Ofcom's Motion, but rather Ofcom's conduct in the United States which is the subject of this case.

4chan has attempted to explain to the Ofcom its U.S. rights in this matter on multiple occasions, to no avail. The Motion references Plaintiff 4chan's response to Ofcom's decision issued against it: "When Ofcom issued a decision finding that 4chan had failed to comply with its

requests, 4chan responded: 'Thank you for the several dozen pages of, in America, legally void correspondence. It will make excellent bedding for my pet hamster.'" (Motion at 1)

Correcting the record, Plaintiff 4chan's counsel, who sent that communication, does not in fact own a hamster. The hamster e-mail was a humorous way to convey a serious point: the Section 100 Orders have no legal effect in the United States. As a result, 4chan's destruction-by-shredding of the Section 100 Orders, a necessary step to convert Ofcom's letters into comfy hamster bedding, would have no legal consequences in the United States, contrasted with the unlawful destruction of a lawfully served summons, which could have serious legal consequences.

The Motion also includes a lengthy discussion much about what the OSA purports to require Plaintiffs to do in the UK under UK law: the phrase "the Act requires" or similar language is used to describe Plaintiffs' purported obligations under the OSA at least six times (Motion at 1, 4, 5, 6, 8). But nothing in the Motion explains why Plaintiffs, as a matter of U.S. law, are obliged to obey Ofcom's orders in the United States, and nothing in the Complaint asks this Court to intrude into the UK's domestic laws, or codes of practice and procedures established thereunder. In this lawsuit, Plaintiffs ask the Court to determine only the legal effect in the United States of Ofcom's Section 100 Orders that were sent into the United States to the Plaintiffs. No court in the United Kingdom has the jurisdiction to declare, for American citizens on American soil, that, as a matter of United States law, the Section 100 Orders failed to effect service or that Americans on U.S. soil have no domestic legal obligation in the United States to comply with them.

If the Section 100 Orders were not validly served, and the Court concludes that it has jurisdiction over this action, the analysis ends and judgment should be entered for the Plaintiffs on counts I and II of the Complaint. Only if the Court determines that valid service occurred does it need to reach the second question: whether the Section 100 Orders, so served, would be

unconstitutional in the United States. These questions are questions only a United States court, not a UK court, can properly decide.

### IV.    PLAINTIFF KIWI FARMS HAS STANDING

Ofcom asserts that "Ofcom has not opened any investigation into Kiwi Farms's compliance with the Act, has not issued any provisional notice of contravention to Kiwi Farms, has not issued any confirmation decision to Kiwi Farms, and has not imposed any penalties on Kiwi Farms." (Motion at 26)  Plaintiff Kiwi Farms alleges, however, that  Ofcom has purported to serve Plaintiff Kiwi Farms with a Section 100 Order under Section 100 of the OSA.  Section 100(1) of the OSA states that "OFCOM may by notice under this subsection require a person… to provide them with any information that they require for the purpose of exercising, or deciding whether to exercise, any of their online safety functions." OSA Section 100(1).  The Act does not prescribe a particular form for the notice, or state what content such a notice must contain, or even that the notice identify itself as a Section 100 Order.  Section 100(5) of the OSA also states that "[t]he persons within this subsection are… a provider of a user-to-user service[.]" OSA, Section 100(5). Plaintiff Kiwi Farms is a user-to-user service as such term is used in the OSA.  Furthermore, Section 100(6) of the OSA states that "[t]he information that may be required by OFCOM under subsection (1) includes, in particular, information that they require for… the purpose of assessing compliance with… any duty or requirement set out in Chapter 2, 3, 4, or 5 of Part 3." OSA, Section 100(6)(a)(i).

In an e-mail to Plaintiff Kiwi Farms dated July 25 2025, Ofcom demanded of Plaintiff Kiwi Farms that it "Please clarify the following by no later than 17:00 BST on 30th July 2025… the measures Lolcow LLC has taken, or plans to take, to ensure compliance with the Online Safety Act (OSA)[.] As outlined previously, the purpose of the OSA is to protect UK-based users of internet services from exposure to illegal content and material that may be harmful to children."

Safety duties in relation to illegal content and content that may be harmful to children, the subject of Ofcom's inquiry on July 25, 2025, are found in Chapter 2 of Part 3 of the OSA at Sections 10, 12, and 13, respectively.

Indeed, in its e-mail of July 25, 2025 to Plaintiff Kiwi Farms, Ofcom therefore required Plaintiff Kiwi Farms, a "person" to which Section 100 of the OSA applied by dint of Section 100(5) of the OSA,  to provide information that Ofcom required for the purpose of exercising, or deciding whether to exercise, any of its online safety functions in relation to information set out at Section 100(6) of the OSA. Plaintiff Kiwi Farms was, therefore, deemed by UK law, specifically Section 208 of the OSA, to have been served 48 hours after its transmission: per Section 208(11) of the OSA, "A notice sent by e-mail is treated as given 48 hours after it was sent, unless the contrary is proved." OSA, Section 208(11).

It is hard to imagine how these facts, and the broad expanse of global power which Ofcom arrogates to itself, can be consisted with the claim in the Motion that "Ofcom has not opened any investigation into Kiwi Farms's compliance with the Act, has not issued any provisional notice of contravention to Kiwi Farms, has not issued any confirmation decision to Kiwi Farms, and has not imposed any penalties on Kiwi Farms."  In any event, the Complaint adequately alleges that Kiwi Farms has already been harmed, notwithstanding that there is still more that Ofcom can do to impose costs and loss of revenue on it.  See, *Some, Inc. v. Hanover Ins. Co.*, *supra*, 2021 U.S. Dist. LEXIS 129796 at *11. Failure to comply with the provisions of these communications exposed Plaintiff Kiwi Farms to immediate legal jeopardy. Ofcom's e-mail of July 25, 2025 to Plaintiff Kiwi Farms communicated a credible threat of enforcement and penalties under UK law, requiring Plaintiff Kiwi Farms to adjust its conduct and incur compliance and defensive costs in response. For this reason, regardless of Ofcom's internal characterization of communications sent under the

UK's new regulatory regime, under the plain language of the OSA, this e-mail was, and Kiwi Farms was entitled to treat this e-mail for all intents and purposes as, a Section 100 Order in relation to which Plaintiff Kiwi Farms was deemed served and required to obey.

Accordingly, Kiwi Farms is entitled to a judicial determination whether service of the Section 100 Orders served upon it was performed validly.

## CONCLUSION

Ofcom's activities in the United States cannot lawfully be a sovereign function and can only lawfully be carried out by private actors. These activities therefore fall within the "commercial activity" exception to the FSIA.

Ofcom's comity and *forum non conveniens* arguments are not issues in this lawsuit. The only issue in this case is whether Plaintiffs were validly served with Defendant's Section 100 Orders in the United States, properly, i.e., through the Hague Service Convention, the US-UK Mutual Legal Assistance Treaty procedure, or letters rogatory. Defendant, in its motion, admits that all of its communications to Plaintiffs were sent by e-mail.

Plaintiff Kiwi Farms was served with a Section 100 Order, as defined by the Online Safety Act, and has suffered both actual and imminent injury as a direct result.

All Plaintiffs seek in this action is a declaration that those Section 100 Orders, transmitted by e-mail, did not effect valid service in the United States.

The Court should deny Defendant Ofcom's motion and allow Plaintiffs' suit to proceed.

COLEMAN LAW FIRM, PC

By: _Ronald D. Coleman_
Ronald D. Coleman

DDC Bar ID: NY0460
50 Park Place, Suite 1105

Newark, NJ 07102
973-264-9611
rcoleman@colemanlaw-pc.com

BYRNE & STORM, P.C.
Preston J. Byrne
DDC Bar ID: 1721858
782-788 Boston Post Rd, Suite 204
Madison, CT 06443
203-900-4076
preston@byrnestorm.com

*Attorneys for Plaintiffs*

Dated:  December 29, 2025