**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| 4CHAN COMMUNITY SUPPORT LLC, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | Civil Action No.: 25-2880 (RC) |
| | : | |
| v. | : | Re Document No.: 8 |
| | : | |
| THE UK OFFICE OF COMMUNICATIONS a/k/a OFCOM, | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM OPINION**

**GRANTING DEFENDANT'S MOTION TO DISMISS FOR LACK OF JURISDICTION**

## I. INTRODUCTION

Plaintiffs 4chan Community Support LLC ("4chan") and Lolcow LLC ("Lolcow") bring this action against Defendant the UK Office of Communications ("Ofcom"). They allege that Ofcom, a British telecommunications regulator, violated their rights under United States law by investigating them for potential violations of British law and threatening them with fines and imprisonment. In response, Ofcom invokes immunity under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602–1611. Because the Court concludes that the FSIA applies, it dismisses Plaintiffs' suit for lack of subject-matter jurisdiction.

## II. FACTUAL BACKGROUND

### A. The Parties

This case spawned from a series of interactions between Plaintiffs, two American internet companies, and Ofcom. Plaintiff 4chan "runs an Internet imageboard website" that it describes as "controversial," while Lolcow administers a website called Kiwi Farms that operates as a "discussion forum that focuses on Internet culture" and is also self-described as "controversial."

Compl. ¶¶ 17–18, 21–22, ECF No. 3-1. According to the Complaint, neither 4chan nor Lolcow has any "presence, operations, or infrastructure outside the territorial limits of the United States." *Id.* ¶¶ 20, 24.

Ofcom is a statutory corporation created by the British Parliament. *See* Office of Communications Act 2002, c. 11, § 1(1). Most of its board members are appointed by members of the British government, including the Secretary of State of the Department of Science, Innovation, and Technology, among other government ministers. *See id.* § 1(3), (6). The Secretary of State retains authority to remove Ofcom's chairman and non-executive members for cause. *Id.* sch. 2(4). Ofcom is considered a public authority under the United Kingdom's Freedom of Information Act, and its records are deemed public for purposes of the Public Records Act. *Id.* sch. 22–23. Nevertheless, Ofcom is not "treated for any purposes as a body exercising functions on behalf of the Crown," and none of its employees are "treated as a servant of the Crown." *Id.* § 1(9).

According to Martin Ralph Ballantyne, the General Counsel and Legal Group Director of Ofcom, because Parliament created Ofcom as a statutory corporation, its "powers, functions, and duties derive from legislation enacted by Parliament." Decl. of Martin Ralph Ballantyne ("Ballantyne Decl.") ¶¶ 1, 4, ECF No. 8-1. Ofcom maintains a "separate legal personality from the UK government and the capacity to sue and be sued in its own name." *Id.* ¶ 4. But, unlike private corporations, "Ofcom has no share capital or shareholders." *Id.*

Much of Ofcom's regulatory authority derives from the Communications Act 2003. Through that law, Parliament transferred to Ofcom a wide swath of regulatory authority over telecommunications. *See* Communications Act 2003, c. 11, §§ 2–3. The law declared that "[i]t shall be the principal duty of OFCOM, in carrying out their functions . . . (a) to further the

interests of citizens in relation to communications matters; and (b) to further the interests of consumers in relevant markets, where appropriate by promoting competition." *Id.* § 3(1).

Recently, Parliament expanded Ofcom's regulatory authority even further. The Online Safety Act 2023 "provide[d] a new regulatory framework which ha[d] the general purpose of making the use of internet services regulated by th[e] Act safer for individuals in the United Kingdom." Online Safety Act 2023, c. 50, § 1(1). "To achieve that purpose, th[e] Act (among other things) . . . confer[ed] new functions and powers on the regulator, OFCOM." *Id.* § 1(2). The law charged Ofcom with "prepar[ing] and issu[ing] a code of practice for providers" to ensure compliance with a series of duties, "which, in broad terms, require providers of service . . . to identify, mitigate and manage the risks of harm" from "illegal content and activity" and "content and activity that is harmful to children." *Id.* §§ 1(2), 41(1)–(4). It also authorized Ofcom to promulgate regulations regarding the calculation of qualifying providers' "worldwide revenue." *Id.* § 85. To cover the expenses of these new responsibilities, Parliament enabled Ofcom to charge "provider[s] of a regulated service" fees, subject to certain limitations. *See id.* §§ 84–88.

Although the Court does not undertake to describe all of Ofcom's regulatory powers, two are particularly relevant here. First, the Online Safety Act gave Ofcom investigatory powers. Ofcom may issue "information notices," which require recipients to give Ofcom "any information that they require for the purpose of exercising, or deciding whether to exercise, any of their online safety functions." *Id.* §§ 100(1), 102. Ofcom may also "open an investigation into whether a provider of a regulated service has failed, or is failing, to comply with" certain requirements under the act, and "the provider must co-operate fully with the investigation." *Id.* § 105(1). These investigative powers are backed by the force of law. "A person commits an

offence if the person fails to comply with a requirement of an information notice." *Id.* § 109(1). If a person is convicted of such an offense, they may be fined. *See id.* § 113(1).

Second, the Online Safety Act equips Ofcom with two enforcement tools: (1) provisional notices of contravention and (2) confirmation decisions. Provisional notices of contravention put a provider on notice that, in Ofcom's view, "there are reasonable grounds for believing that the provider has failed, or is failing, to comply with any enforceable requirement . . . that applies in relation to the service." *Id.* § 130(1). Enforceable requirements encompass a host of duties set forth in the statute—including illegal content, children's online safety, and record-keeping requirements. *See id.* § 131.

If, after issuing a provisional notice of contravention, Ofcom determines that the recipient "has failed, or has been failing, to comply with a notified requirement, OFCOM may give the person a" confirmation decision. *Id.* § 132(3). The confirmation decision may "require the person to take [specified] steps," may "require the person to pay a penalty," or "both." *Id.* § 132(5); *see also id.* § 137 (detailing permissible penalties including a "daily rate penalty"). Fines can reach up to the greater of £18 million or 10% of the recipient's qualifying worldwide revenue. *Id.* sch. 13 ¶ 4(1). The confirmation decision creates "a duty to comply with requirements included in the decision," and Ofcom may enforce those duties "in civil proceedings." *Id.* § 133(8)–(9). Failure to comply with a confirmation decision may result in fines or even imprisonment. *Id.* § 138(1), (4). Confirmation decisions and other penalties are subject to judicial review by British courts. *Id.* § 168.

**B. Ofcom's investigations into Plaintiffs**

The parties give slightly different accounts of their interactions. Starting with its interactions with 4chan, Ofcom tells that it initially made a determination that 4chan was subject

to the Online Safety Act because the website represented that it had "over 20 million unique visitors per month and that over 7% of 4chan's user base [was] UK users." Ballantyne Decl. ¶ 40. Moreover, the website "markets [its] platform to advertisers on the basis" of that 7% of British users, "the second largest percentage behind the United States." *Id.* ¶ 41.

The Parties agree that on April 14, 2025, Ofcom sent 4chan an "information notice"—though Ofcom claims that it made previous outreach attempts as well. Compl. ¶ 73; Ballantyne Decl. ¶¶ 43–44. According to Ofcom, the information notice sought "a written record of the illegal content risk assessment that 4chan was required to prepare under the Act." Ballantyne Decl. ¶ 44. Plaintiffs allege that the notice warned that "'failure to comply' with it 'may also constitute a criminal offense'" and "may result in a fine of £18 million or 10% of 4chan's worldwide turnover, arrest, and/or 'imprisonment for a term of up to two years, or a fine (or both).'" Compl. ¶ 74.

Plaintiffs allege that Ofcom followed up with similar letters and threats, which they maintain where not properly served under the "US-UK Mutual Legal Assistance Treaty." *See id.* ¶¶ 75–87. Ofcom describes only a second information notice "seeking information about 4chan's qualifying worldwide revenues as relevant to any potential penalties under the Act," which according to Plaintiffs was also served improperly. Ballantyne Decl. ¶ 44; Compl. ¶ 87. Ofcom states that it opened a formal investigation into 4chan in June 2025. *See* Ballantyne Decl. ¶ 44.

Whatever the exact chain of events, the parties agree that on August 12, 2025, Ofcom sent 4chan a "Provisional Decision"—or, as Ofcom characterizes it, a "provisional notice of contravention"—stating that 4chan had violated its obligations under Section 102(8) of the Online Safety Act. *Id.* ¶ 45; Compl. ¶ 88. The notice "threatened to impose a fine of

£20,000 . . . as well as daily fines of £100 . . . for up to a maximum of sixty days." Compl. ¶ 89; *see* Ballantyne Decl. ¶ 48. This too, Plaintiffs allege, was not properly served. *See* Compl. ¶¶ 90–91. According to Ofcom, 4chan responded to the notice by invoking the First Amendment, claiming improper service, and raising other objections. Ballantyne Decl. ¶ 46.

Plaintiffs end their story there, at least with respect to 4chan, because Plaintiffs brought this suit on August 27, 2025. ECF No. 1. But Ofcom recounts that in October 2025, it "sent a confirmation decision to 4chan adhering to the findings made in its provisional notice of contravention." Ballantyne Decl. ¶ 47. 4chan, through counsel, thanked Ofcom "for the several dozen pages of, in America, legally void correspondence." *Id.* ¶ 47. 4chan's counsel shared with Ofcom that the confirmation decision would "make excellent bedding for [their] pet hamster." *Id.* In its motion, Ofcom represents that it has initiated enforcement proceedings against 4chan in the United Kingdom. *See* Def. Ofcom's Mem. P. & A. Supp. Mot. Dismiss ("Def.'s Mot.") at 26, ECF No. 8 at 26 ("Ofcom has brought enforcement proceedings against 4chan, and those proceedings remain ongoing.").

Ofcom's investigation of Lolcow followed a similar path. Ofcom first "determined that [Lolcow] was likely to fall within the scope of" the Online Safety Act because Ofcom believed it provided "user-to-user service that was available to UK users." Ballantyne Decl. ¶ 49. Then, the parties agree, Ofcom sent Lolcow a letter in March 2025 advising Lolcow that Ofcom believed it was subject to the Online Safety Act and that Ofcom would be sending an information notice shortly. *See id.* ¶ 50; Compl. ¶¶ 92–98. Plaintiffs allege that the letter also threatened financial penalties if Lolcow failed to comply with "Ofcom's demands." Compl. ¶ 99.

Like 4chan, Lolcow responded to Ofcom's overtures by questioning its authority. But Lolcow favored a historical, rather than a rodential, flair. Lolcow insisted that "where

Americans are concerned, the Online Safety Act purports to legislate the Constitution out of existence. Parliament does not have that authority. That issue was settled, decisively, 243 years ago in a war that the UK's armies lost and are not in any position to relitigate." *Id.* ¶ 101. Lolcow also temporarily blocked access to its website in the United Kingdom. *Id.* ¶¶ 100–03. According to Ofcom, it responded in late April by noting that the website had been blocked in the United Kingdom, and "taking this development into account, Ofcom had decided not to proceed with issuing an information notice" yet "reserved the right to revisit this approach in the future." Ballantyne Decl. ¶ 52.

Here, the parties' stories diverge slightly. In July 2025, Plaintiffs allege that Lolcow's "website was taken down for maintenance," and when access was restored "the UK IP block [was] not yet reactivated as that functionality was not ready to deploy." Compl. ¶ 102. Seeing Lolcow's reactivation, Ofcom sent a letter later that month "requesting clarification of whether [Lolcow] intended to reinstate its previous restrictions on access for UK users" and "request[ing] details of the measures [Lolcow] had taken, or planned to take, to ensure compliance with the [Online Safety] Act." Ballantyne Decl. ¶ 53. Plaintiffs understood this letter—which they allege "was not validly served under the US-UK Mutual Legal Assistance Treaty"—to "demand[ ] that [Lolcow] comply with the" Online Safety Act. Compl. ¶¶ 103, 108. In defiance of Ofcom's assertion of authority, Lolcow "decided not to restore the IP block of the UK." *Id.* ¶ 104; *see also* Pls.' Opp'n Def.'s Mot. Dismiss ("Pls.' Opp'n") at 10, ECF No. 10 (explaining that Lolcow "decided that it had an obligation to do its part to defend the First Amendment, and resist"). Ofcom, for its part, states that Lolcow's counsel told it that "the IP blocking feature is currently down for maintenance" but that "once it is back up, my client will, in all probability, restore the nation-level block on the UK." Ballantyne Decl. ¶ 54. As of December 1, 2025, Ofcom states

that it had not sent any information notices, opened any investigations, nor initiated any enforcement proceedings against Lolcow. *Id.* ¶ 55.

**C. Plaintiffs' suit**

In August 2025, Plaintiffs sued Ofcom. *See* ECF No. 1. They allege that Ofcom's conduct—specifically the information notices—violate the "First, Fourth, and Fifth Amendments of the United States Constitution; conflict with Section 230 of the Communications Decency Act; . . . are incompatible with the requirement of due process of law; and are for these and other reasons repugnant to United States public policy." Compl. ¶¶ 132–47. Plaintiffs also allege that the information notices—and in the case of 4chan the provisional notice of contravention—were improperly served. *See Id.* ¶¶ 117–131. For all counts, Plaintiffs seek declaratory relief as well as an injunction preventing Ofcom from enforcing the Online Safety Act against them or from further improper service. *See id.*, Prayer for Relief.

Defendants move to dismiss the complaint in its entirety. They argue that this Court lacks subject-matter jurisdiction over the case because Ofcom enjoys foreign-sovereign immunity under the FSIA and Lolcow lacks standing. *See* Def.'s Mot. at 10, 26–27. Ofcom also argues that the Court should dismiss the complaint on the grounds of *forum non conveniens* and international comity. *Id.* at 23, 25. The Court addresses only Ofcom's first argument and concludes that it lacks subject-matter jurisdiction.

## III. LEGAL STANDARD

The party invoking federal sovereign immunity under the FSIA bears the burden of establishing the defense. *See EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.*, 894 F.3d 339, 345 (D.C. Cir. 2018). That includes establishing "that the plaintiff's asserted statutory exception to immunity does not apply." *Zhongshan Fucheng Indus. Inv. Co. LTD v. Fed.*

*Republic of Nigeria*, 112 F.4th 1054, 1061 (D.C. Cir. 2024), *cert. dismissed sub nom.*, *Nigeria v. Zhongshan Fucheng Inv. Co.*, 145 S. Ct. 1352 (2025). *But cf. Wye Oak Tech., Inc. v. Republic of Iraq*, 24 F.4th 686, 696 (D.C. Cir. 2022) (suggesting that the plaintiff bears a burden of production to establish that an exception applies, even though the defendant retains the ultimate burden of persuasion).

Here, the Court considers Ofcom's FSIA defense in the context of a motion to dismiss filed before any responsive pleadings. In this context, there are two main ways that a defendant may challenge a court's subject-matter jurisdiction, and the method of attack affects the legal standard. "If the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, then the district court should take the plaintiff's factual allegations as true and determine whether they bring the case within any of the exceptions to immunity invoked by the plaintiff." *Phoenix Consulting Inc. v. Republic of Angl.*, 216 F.3d 36, 40 (D.C. Cir. 2000). In other words, this type of challenge is treated like the familiar motion to dismiss under Fed. R. Civ. P. 12(b)(6), focusing only on the sufficiency of the allegations. *See EIG Energy Fund XIV*, 984 F.3d at 345.

If, on the other hand, the motion to dismiss "contest[s] a jurisdictional fact alleged by the plaintiff . . . the court may not deny the motion to dismiss merely by assuming the truth of the facts alleged by the plaintiff and disputed by the defendant." *Phoenix Consulting*, 216 F.3d at 40. In this scenario, "the court must go beyond the pleadings and resolve any [relevant] disputed issues of fact." *Id.* For purposes of this motion, the parties largely agree on the facts,

but Ofcom has provided, through a declaration, some additional factual background, especially regarding its own functions.[1]

## IV. ANALYSIS

The FSIA is "the sole basis for obtaining jurisdiction over a foreign state in our courts." *CC/Devas (Mauritius) Ltd. v. Antrix Corp.*, 605 U.S. 223, 229 (2025) (quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). The statute declares that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the states" unless an exception applies. 28 U.S.C. § 1604. Thus, if Ofcom is a foreign state, and no exception applies, this Court lacks subject-matter jurisdiction over Plaintiffs' suit and cannot consider the merits of Plaintiffs' claims.

This leads to the four issues that the parties raise regarding Ofcom's claim of foreign sovereign immunity: (1) Does Ofcom qualify as a foreign state under the FSIA; (2) if Ofcom is a foreign state, does the commercial-activity exception apply; (3) should the Court permit

[1] There is some conflict amidst D.C. Circuit authority as to whether a court must accept well-pleaded factual allegations as true under Fed. R. Civ. P. 12(b)(1) and entertain only non-contradictory evidence put forth by the defendant, or whether it may resolve factual issues alleged in the complaint when a party presents contrary evidence. For example, the D.C. Circuit has said that "while the district court may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction, the court must still accept all of the factual allegations in the complaint as true." *Jerome Stevens Pharmas. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) (cleaned up). Yet the D.C. Circuit has also rejected the argument that courts must accept the truth of allegations when considering a motion to dismiss for lack or subject-matter jurisdiction at the pleading stage. *See, e.g.*, *Jibril v. Mayorkas*, 101 F.4th 857, 866 (D.C. Cir. 2024) (rejecting appellants' argument that the district court "should have treated the complaint's factual allegations as true at the motion to dismiss stage"), *cert. denied*, 145 S. Ct. 550 (2024); *De Csepel v. Republic of Hung.*, 27 F.4th 736, 743 (D.C. Cir. 2022) (stating that courts must reach beyond the pleadings to resolve disputed issues of fact). The weight of authority appears to fall on the side of resolving relevant factual disputes. In any event, here the Court need not resolve any discrepancies between Plaintiffs' factual allegations and Ofcom's evidence to determine that it lacks subject-matter jurisdiction.

jurisdictional discovery regarding that exception; and (4) would applying the FSIA here be untenable? The Court addresses each argument in turn.

The first two issues—the main issues in this case—involve related questions. First, is Ofcom a "foreign state" within the meaning of Section 1603(a)? That includes a "foreign state" itself, its "political subdivisions," and "an agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a). Courts in this Circuit use the so called "categorical approach" to evaluate whether an entity is a foreign state or political subdivision thereof. *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 151 (D.C. Cir. 1994). The categorical approach asks "whether the core functions of the foreign entity are predominantly governmental or commercial." *Id.* Second, if Ofcom is a foreign state, does its conduct fall within the commercial-activity exception? To fit within that exception, the action "must be 'based upon' some 'commercial activity' by [the defendant] that had 'substantial contact' with the United States." *Saudi Arabia v. Nelson*, 507 U.S. 349, 356 (1993); *see* 28 U.S.C. §§ 1603(e), 1605(a)(2).

These inquiries share obvious similarities—they both revolve around the distinction between commercial and governmental activity—but they remain analytically distinct. Determining whether the defendant is a foreign state (or its political subdivision) requires considering the defendant's "functions," i.e., its general activity and operations. *Transaero*, 30 F.3d at 151. The commercial-activity exception, by contrast, focuses on the "particular conduct on which the [plaintiff's] action is 'based.'" *Nelson*, 507 U.S. at 356. Thus, even if a defendant qualifies as a state actor because their ordinary operations involve governmental (as opposed to commercial) activity, the conduct at issue in a particular case may still be commercial and therefore qualify for the commercial-activity exception.

**A. Ofcom is a foreign state for purposes of the FSIA**

Initially, Ofcom contends that Plaintiffs forfeited any argument that Ofcom is not a foreign state within the meaning of Section 1603(a), and the Court agrees. Litigants do not meaningfully raise an argument by "incorporating by reference an argument made at an earlier stage in the litigation" because doing so may deny opponents "a fair chance to respond to" the argument. *Al-Tamimi v. Adelson*, 916 F.3d 1, 7 (D.C. Cir. 2019); *see also Briscoe v. Costco Wholesale Corp.*, 61 F. Supp. 3d 78, 83 n.2 (D.D.C. 2014). Here, Plaintiffs have done even less than that. Plaintiffs write that they "disagree with th[e] premise" that Ofcom is a foreign state "for the reasons given in the Complaint." Pls.' Opp'n at 20. They continue that "[n]othing in this Opposition should be read as a concession that Ofcom is a 'foreign state.'" *Id.* Plaintiffs nowhere identify which allegations they are referring to, and they do not explain how those allegations connect to the legal standard.

In fairness to Plaintiffs, they may not have intended to contest Ofcom's argument at this stage but simply sought to reserve the right to challenge it later. But, to the extent Plaintiffs intend to argue that Ofcom is not a foreign state now, they rely on the Court to independently divine that argument from the factual allegations in their complaint. Plaintiffs cannot foist the work of discerning their argument on the Court. *See Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005) (finding forfeiture where a party "mention[ed]" but failed to develop an argument, "leaving the court to do counsel's work"); *see also Bronner ex rel. Am. Stud. Ass'n v. Duggan*, 962 F.3d 596, 611 (D.C. Cir. 2020) ("Arguments in favor of subject matter jurisdiction can be waived by inattention or deliberate choice." (cleaned up)).

In any event, the Court also agrees with Ofcom that it is a foreign state actor for purposes of Section 1603(a). As explained above, a defendant qualifies as a foreign state actor (as

opposed to an agency or instrumentality thereof) under the FSIA if its "core functions . . . are governmental" rather than commercial. *Transaero*, 30 F.3d at 153. Ofcom's core functions involve the regulation of telecommunications. *See* Communications Act 2003, c. 11, § 2 sch. 1 (listing functions transferred from other regulators to Ofcom); *see also* Ballantyne Decl. ¶ 18. By statute, its "principal duty" is "to further the interests of [British] citizens in relation to communications matters." Communications Act 2003, c. 11, § 3(1); *see also* Ballantyne Decl. ¶ 20. The Online Safety Act further authorizes Ofcom to issue certain regulations, conduct investigations, and bring enforcement actions against regulated entities—all backed by the threat of fines and imprisonment. *See* Online Safety Act 2023, c. 50, § 85 (describing authority to promulgate regulations); *id.* §§ 100(1), 109(1), 113 (describing information notices and their penalties); *id.* §§ 130(1), 132(5), 133, 138 (describing enforcement proceeding); *see also* Ballantyne Decl. ¶¶ 24, 29–35.

These are quintessential government functions. Ofcom creates legal rules that bind other parties (regulations), investigates violations of law (information notices), and enforces the law by imposing penalties (confirmation decisions). "'[T]he power to create and enforce a legal code, both civil and criminal' is one of the quintessential functions of a State." *Diamond v. Charles*, 476 U.S. 54, 65 (1986) (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982)) (holding that private citizens lack standing to defend the constitutionality of a law when the state declines to defend it). And, as Ofcom points out, that sovereign right applies to telecommunications. *See* Def.'s Mot. at 14. By international treaty, "[i]t is the sovereign right of each country to regulate its telecommunications." *Cable & Wireless P.L.C. v. Fed. Commc'ns Comm'n*, 166 F.3d 1224, 1230 (D.C. Cir. 1999) (quoting preamble to the International Telecommunications Union Treaty).

Plaintiffs dispute little of this. They themselves allege that "Ofcom is a statutory corporation charged with regulating broadcasting and online communications within the United Kingdom." Compl. ¶ 25. And they acknowledge—indeed lament—that British law empowers Ofcom to "issue demands" backed by the force of law and criminal penalties. *Id.* ¶¶ 55–58, 65.

To the extent the Court can discern any counterarguments in Plaintiffs' complaint, they are unpersuasive because they rely on Ofcom's form rather than its functions. Plaintiffs allege that Ofcom describes itself as "independent of government and the companies [it] regulates." *Id.* ¶ 28. Plaintiffs also classify Ofcom as "a private corporation" that is "funded by the companies it purports to regulate," rather than by taxpayers. *Id.* ¶¶ 28, 30, 36. And Ofcom itself acknowledges that it has a "separate legal personality from the UK Government and the capacity to sue and be sued in its own name." Ballantyne Decl. ¶ 4.

Ofcom's legal independence does not convert it into a commercial entity because it still exercises sovereign power. The D.C. Circuit's categorical test emphasizes the entity's "core *functions*," rather than its form. *Transaero*, 30 F.3d at 153 (emphasis added). In adopting this test, the court explained that "any nation may well find it convenient (as does ours) to give powers of contract and litigation to entities that on any reasonable view must count as part of the state itself." *Id.* at 152. *Transaero*'s definition of a foreign state encompasses all non-commercial governmental entities. *See id.* Thus, Ofcom's independence does not make it a commercial entity for purposes of the FSIA, and it is therefore part of a foreign state.[2]

[2] Admittedly, *Transaero* addressed the distinction between foreign states and their instrumentalities or agencies, rather than the distinction between private entities and government-related entities. *See id.* at 151. But the Court finds this mode of analysis appropriate because, if Ofcom qualifies as a foreign state, then it must *a fortiori* qualify as a government-related entity for purposes of the FSIA. Moreover, given that the reason the Court finds Ofcom to be a foreign state is because it is exercising sovereign power by creating and enforcing government

That is not to say that Ofcom's independence is entirely irrelevant. It is perhaps possible that a private entity, free from government control, would not qualify as a foreign state notwithstanding its exercise of what would traditionally be regarded as sovereign power. Here, however, Ofcom has demonstrated that it bears a sufficient connection to the British government. Government officials either appoint or approve most of Ofcom's board members, and the Secretary of State may remove many of Ofcom's leaders. Office of Communications Act 2002, c. 11, § 1(3), (6); *id* sch. 2(4). The British government also supervises and exercises control over Ofcom's finances. *See* Ballantyne Decl. ¶¶ 9, 11. So Ofcom is not entirely independent, and Plaintiffs' conclusory allegation that Ofcom is "a private corporation," Compl. ¶ 30, does not overcome the weight of Ofcom's government functions.

**B. Ofcom's conduct in this case does not fall within the commercial-activity exception**

Plaintiffs argue that, even if Ofcom is part of a foreign state, it cannot invoke foreign sovereign immunity because Ofcom's conduct fits Section 1605(a)(2)'s commercial-activity exception. Pls.' Opp'n at 20. As its name suggests, that exception applies only if the suit is "based on" the defendant's "commercial activity." *Saudi Arabia v. Nelson*, 507 U.S. 349, 356 (1993) (quoting 28 U.S.C. § 1605(a)(2)). The commercial activity must be "the 'gravamen'" of the suit. *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 35 (2015). And "commercial activity" is defined as "either a regular course of commercial conduct or a particular commercial transaction or act," with the "character of the activity . . . determined by reference to the nature of the course of conduct or particular transaction or act." 28 U.S.C. § 1603(d).

---

regulations, these same characteristics seem relevant for distinguishing private and governmental entities.

The Court concludes that Ofcom's alleged conduct does not fall within the commercial-activity exception. Although the precise contours of what constitutes commercial activity may be unclear, the Supreme Court has distinguished commercial activity from regulatory activity. *See Republic of Arg. v. Weltover, Inc.*, 504 U.S. 607, 614 (1992). The exception does not apply when the state acts "as a regulator of a market," as opposed to "in the manner of a private player within" that market. *Id.* at 614. "The issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in trade and traffic or commerce.'" *Id.* (cleaned up).

Here, the gravamen of Plaintiffs' complaint is that Ofcom used its power to threaten to "impose ruinous civil penalties and referrals to law enforcement for criminal penalties, including arrest and imprisonment." Compl. ¶ 5. This includes threatening 4chan that failure to comply with a "legally binding information notice" could result in a fine of £18 million and imprisonment, *id.* ¶ 73–74, and opening an "investigation into 4chan for suspected violations of 'illegal content risk assessment duties,' 'safety duties about illegal content,' 'record keeping and review duties,' and 'Section 102(8) duties about information notices,'" *id.* ¶ 79. Ofcom then found that 4chan had violated British law. *Id.* ¶ 88. Ofcom issued analogous information notices against Lolcow as well. *See id.* ¶¶ 107, 109.

For similar reasons to those provided above, the Court classifies this conduct as regulatory, rather than commercial. Plaintiffs allege that Ofcom is investigating, and perhaps prosecuting, violations of British law. That is classic regulator, and thus sovereign, behavior. *See Weltover*, 504 U.S. at 614; *cf. Fed. Commc'ns Comm'n v. AT&T, Inc.*, 608 U.S. 531, 535–36 (2026) (noting that the Federal Communications Commission is tasked with "investigat[ing] regulated parties for suspected violations of the communications laws"); *Telecomm. Rsch. &*

*Action Ctr. v. Fed. Commc'ns Comm'n*, 836 F.2d 1349, 1356 (D.C. Cir. 1988) (explaining that it is the Federal Communications Commission's "responsibility . . . to regulate broadcast services," not that of private citizens).

Plaintiffs resist this conclusion by arguing that Ofcom's conduct is commercial because it would be unconstitutional if it were carried out by an American regulator. *See* Pls.' Opp'n at 22. Because, in their view, the First Amendment would prohibit analogous regulatory activity in the United States, Plaintiffs contend that the closest analogy for the measures that Ofcom seeks to compel is the voluntary adoption of similar measures by commercial actors. *See id.*

Even without deciding whether Ofcom's conduct would be unlawful coming from an American regulator, Plaintiffs' argument suffers two fatal flaws. First, nothing in the case law that Plaintiffs cite holds that the distinction between regulatory and commercial activity turns on what an *American* sovereign is empowered to do. *See id.* On the contrary, the Supreme Court has held that activity which amounts to an "abuse of [ ] power," and would presumably violate the United States Constitution, still constitutes sovereign activity "however monstrous such abuse undoubtedly may be." *Nelson*, 507 U.S. at 361 (holding that wrongful arrest and imprisonment, as well as torture, were "peculiarly sovereign in nature"); *see also Ryzhov v. Russian Fed'n*, No. CV 23-2794 (RC), 2024 WL 81281, at *4 (D.D.C. Jan. 8, 2024) (holding that acts, including "threatening criminal prosecution," are "the acts of a sovereign, even if the alleged acts amount to abuses of authority"). The Court reasoned that the inquiry turns on whether the alleged actions are "the sort of action by which private parties can engage in commerce." *Nelson*, 507 U.S. at 362. Private entities do not generally engage in commerce by censoring others through the threat of fines and imprisonment, so the conduct is not commercial.

Second, even assuming the proper inquiry is trained on whether the activity resembles permissible regulatory behavior in America, the compulsory nature of Ofcom's demands and enforcement procedures aligns them more closely with American regulatory activity than voluntary commercial conduct. Voluntarily adopting content-moderation standards is not the same as being compelled to do so by a government regulator—often backed, as in this case, by the threat of fines or imprisonment. It is the difference between gifting someone $50 and being mugged with $50 in your wallet. The result may be the same—$50 less in your pocket—but few would equate the means. Indeed, Plaintiffs make the same point in their complaint, alleging that "[u]nlike policy frameworks which have been developed in-house, however, Ofcom's commercial policymaking purports to be compulsory." Compl. ¶ 40; *see also* Pls.' Opp'n at 7. Because of this fundamental distinction between compulsory and commercial measures, Ofcom's alleged conduct bears greater resemblance to compulsory regulatory requirements imposed by American agencies in other contexts than voluntary content-moderation standards adopted by private companies.

The D.C. Circuit has drawn a similar distinction. *See Rosenkrantz v. Inter-Am. Dev. Bank*, 35 F.4th 854, 865 (D.C. Cir. 2022). In *Rosenkrantz*, the plaintiffs sued over the defendant's "Sanctions Procedures"—a "multi-step internal review process . . . designed to identify and, if necessary, penalize" fraud, corruption, and other prohibited practices. *Id.* at 858, 862. The plaintiffs there argued that because "private market actors use similar investigatory and disciplinary tools to root out internal fraud" the commercial-activity exception should apply. *Id.* at 864. The D.C. Circuit rejected this argument because the Inter-American Development Bank's sanctions authority "derived from its charter, not a singular and discrete contractual relationship," and extended to "*any* party involved with a[ ] [related] contract, regardless of the

existence of a contractual relationship with" the bank. *Id.* at 865. The court held that the bank's "ability to exercise such influence over a wide array of parties and markets—potentially to the point of total exclusion of a particular party from the market—plainly constitutes the exercise of a power peculiar to sovereigns." *Id.* (cleaned up). Like the bank in *Rosenkrantz*, Ofcom is threatening to impose sanctions on a variety of private actors with whom it lacks a contractual or other voluntary relationship. Its only relationship with Plaintiffs is that of a regulator to a regulated party. Perhaps more importantly, like the power to entirely exclude a private party from a market by law, fines and imprisonment are generally sanctions that only sovereigns may levy.

Granted, Plaintiffs point to one example of a private actor—the Global Alliance for Responsible Media—that, Plaintiffs argue, attempted to "pressure companies" into censorship through "boycotts," "work[ing] with global regulators," and "collusion." Pls.' Opp'n at 24–25. But this alleged advocacy by a private party is different in kind from directly imposing regulations with the threat of fines and prison. It would hardly amount to "authoritative control" over speech akin to government regulation. *See Weltover*, 504 U.S. at 614 ("[A] foreign government's issuance of regulations limiting foreign currency exchange is a sovereign activity, because such authoritative control of commerce cannot be exercised by a private party."). Nor is one example sufficient to show that this is activity "typically performed by participants in the market." *Rosenkrantz*, 35 F.4th at 864 (quoting *Mwani v. bin Laden*, 417 F.3d 1, 17 (D.C. Cir. 2005)).

**C. Jurisdictional discovery would be futile**

As a fallback position, Plaintiffs argue that they should at least be permitted "to take jurisdictional discovery to determine the full extent of Ofcom's U.S.-focused activities and

relationships." Pls.' Opp'n at 26. They wish to learn why they were "targeted for enforcement action," "whether this targeting was conducted in coordination with U.S. based commercial actors," and whether Ofcom's conduct "in the United States is commercial in nature." *Id.* at 26–27.

The Court declines to permit jurisdictional discovery because it concludes that doing so would be futile. In the context of jurisdictional discovery, the D.C. Circuit has distinguished between motions to dismiss granted while "tak[ing] the plaintiff's factual allegations as true" and those granted when there is "a dispute over the factual basis of the court's subject-matter jurisdiction." *Phoenix Consulting Inc. v. Republic of Angl.*, 216 F.3d 36, 40 (D.C. Cir. 2000). If the court's decision relies on resolving disputed facts and rejecting the veracity of the complaint's allegations, then the court "must give the plaintiff 'ample opportunity to secure and present evidence relevant to the existence of jurisdiction.'" *Id.* (quoting *Prakash v. Am. Univ.*, 727 F.2d 1174, 1179–80 (D.C. Cir. 1984)).[3] But that rule does not apply when the court relies only on the allegations in the complaint and treats those allegations as true. *See id.*

Because the Court has evaluated the commercial-activity exception by relying only on Plaintiffs' allegations, jurisdictional discovery would be futile. As explained above, it is Plaintiffs' own allegations about what Ofcom has done to them—regulatory investigations and enforcement proceedings—that doom Plaintiffs' complaint. To be sure, the Court has referenced Ofcom's supporting declaration in other parts of the opinion, especially when discussing whether Ofcom is a foreign state. But Plaintiffs have forfeited any challenge to that determination. Nor do Plaintiffs suggest that they are interested in jurisdictional discovery regarding Ofcom's

[3] Of course, in this case, because Ofcom has raised other non-merits grounds for dismissal, such as *forum non conveniens*, the Court would be obliged to address those before granting jurisdictional discovery. *See id.*

*functions*. *See* Pls.' Opp'n at 26–27. They are interested only in Ofcom's conduct in the United States, *see id.*, which would be of little relevance to determining Ofcom's status as a part of a foreign state.

At any rate, the Court does not see how Plaintiffs' proposed discovery would aid their pursuit of jurisdiction. *See Mwani v. bin Laden*, 417 F.3d 1, 17 (D.C. Cir. 2005). Even if Ofcom coordinated with private entities to target Plaintiffs, that would not make Ofcom's conduct commercial because Ofcom would still be investigating and enforcing foreign law. And no matter what other commercial ties Ofcom has to the United States, the commercial-activity exception considers only the activities that are the "gravamen" of the suit. *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 35 (2015). Plaintiffs do not suggest that they would uncover facts relevant to determining whether Ofcom's actions with respect to them were commercial.

**D. Applying the FSIA here does not frustrate the Act's purpose.**

In a final bid to advance their suit, Plaintiffs argue that applying the FSIA here would "stretch the FSIA to the point of untenability." Pls.' Opp'n at 27. They suggest that it would be perverse to apply the FSIA in a manner that "gives Ofcom the right to inject itself directly into the heart of the United States' vibrant economy and run roughshod over the rights of American citizens . . . by threatening Plaintiffs with fines and arrests, all the while remaining utterly immune from the jurisdiction of this Court." *Id.* The Court expresses no view on whether Ofcom has violated the rights of any American citizens. But Plaintiffs' rhetoric runs into two problems.

First and foremost, as explained above, the United States Congress has made a different calculus. Congress could, if it wished, subject foreign governments and their instrumentalities to

suit in the United States, at least where doing so would not offend the United States Constitution. *See Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 18–19 (2025) (leaving open the possibility of constitutional limitations "on the territorial jurisdiction of federal courts"). Congress has chosen, however, to do the opposite. It has shielded foreign governments from suit in American courts as "a matter of grace and comity." *Republic of Hung. v. Simon*, 604 U.S. 115, 118 (2025) (quoting *Rubin v. Islamic Republic of Iran*, 583 U.S. 202, 208 (2018)). That choice is no doubt motivated in part by a desire for reciprocity. *See Bolivarian Republic of Venez. v. Helmerich & Payne Int'l Drilling Co.*, 581 U.S. 170, 179 (2017). Congress hopes that foreign countries will likewise not hail the United States and its instrumentalities into their courts. *See id.*

Second, dismissing Plaintiffs' suit here hardly leaves Plaintiffs defenseless. To start, Plaintiffs may defend themselves in the British courts and avail themselves of the rights afforded to them there. *See* Online Safety Act 2023, c. 50, § 168 (permitting recipients of a confirmation decision to appeal that decision). But even without that, if Ofcom obtains a foreign judgment against Plaintiffs, Ofcom will still need to enforce that judgment. Because Plaintiffs represent that they have "no presence, infrastructure, or operations abroad," Pls.' Opp'n at 5; Compl. ¶¶ 20, 24, that likely means enforcing any judgment in the United States. At that point, Plaintiffs could avail themselves of the protection of American courts. American courts generally decline to enforce foreign judgments that violate the United States Constitution, if indeed Plaintiffs are correct in their constitutional claims. *See, e.g.*, *Matusevitch v. Telnikoff*, 877 F. Supp. 1, 4 (D.D.C. 1995) (refusing to enforce a British judgment because it contravened the First Amendment and was therefore "repugnant to the public policies of the State of Maryland and the United States"), *aff'd*, 159 F.3d 636 (D.C. Cir. 1998) (per curiam).

Congress has even spoken directly to Plaintiffs' concerns. It enacted the SPEECH Act to prevent American courts from "recogniz[ing] or enforc[ing] a foreign judgment for defamation" unless the judgment is consistent with the First Amendment. 28 U.S.C. § 4102(a). The law defines defamation broadly to encompass "any action or other proceeding for defamation, libel, slander, or similar claim alleging that forms of speech are false, have caused damage to reputation or emotional distress, have presented any person in a false light, or have resulted in criticism, dishonor, or condemnation of any person." *Id.* § 4101(1).[4]

Finally, at the risk of gilding the lily, to the extent any foreign judgment against Plaintiffs were penal in nature, Plaintiffs may find a receptive audience before American courts regardless of the judgment's compatibility with the United States Constitution. That is because American courts are not necessarily required to enforce foreign penal judgments. *See Huntington v. Attrill*, 146 U.S. 657, 666 (1892); *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1214 (9th Cir. 2006) (en banc) (plurality opinion); *see also* Restatement (Third) of Foreign Relations Law § 483 (1987) ("Courts in the United States are not required to recognize or to enforce judgments for the collection of taxes, fines, or penalties rendered by the courts of

[4] Plaintiffs themselves appear to recognize this because they allege that the enforcement actions against them are judgments for purposes of the SPEECH Act. *See* Compl. ¶ 65. Notably, the SPEECH Act permits "[a]ny United States person against whom a foreign judgment is entered on the basis of the content of any writing, utterance, or other speech by that person that has been published" to "bring an action in district court, under section 2201(a), for a declaration that the foreign judgment is repugnant to the Constitution or laws of the United States." 28 U.S.C. § 4104(a)(1). Here, however, Plaintiffs do not appear to assert a cause of action under Section 4104(a)(1). *See* Compl. ¶¶ 117–47 (listing four counts without referencing the SPEECH Act). *But see id.* Prayer for Relief (c) (seeking an order that Ofcom's "demands are unenforceable in the United States as inconsistent with . . . the SPEECH ACT"). Even if they had, Plaintiffs advance no argument in their opposition that Section 4104(a)(1) abrogates, or creates an exception to, the FSIA. *Cf. Exxon Mobil Corp. v. Corporación Cimex, S.A.* 146 S. Ct. 1909, 1914 (2026) ("We conclude that the Helms-Burton Act itself abrogates the sovereign immunity of Cuban agencies and instrumentalities. Therefore, plaintiffs who sue Cuban agencies or instrumentalities under the Act are not required to also satisfy an FSIA exception.").

other states.”). Put simply, Plaintiffs’ suit fails because they seek to use American courts as a sword against Ofcom rather than as a shield to protect themselves.

## V. CONCLUSION

For the foregoing reasons, Ofcom’s motion to dismiss is granted and the complaint is dismissed for lack of subject-matter jurisdiction. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: September 15, 2026

RUDOLPH CONTRERAS
United States District Judge